UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone:  212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s):  11-5227                                              United States Securities & Exchange Commission v.

Citigroup Global Markets Inc.

Motion for:  Leave to File Amicus Curiae

Set forth below precise, complete statement of relief sought:

Professors Yeager and Calathes request leave to file a

short Brief as amicus curiae in support of the District

Court's decision, which has been appealed.

MOVING PARTY: Professors Yeager & Calathes          OPPOSING PARTY: _____
    o Plaintiff          o Defendant
    o Appellant/Petitioner          o Appellee/Respondent

MOVING PARTY: In propria Personna          OPPOSING ATTORNEY: _____

Matthew G. Yeager, Ph.D.                    _____
King's University College                   _____
266 Epworth Avenue                          _____
London, Ontario  N6A 2M3
(519) 433-3491, Ext. 4549
E-mail:  myeager@uwo.ca                     _____

Court-Judge/Agency appealed from:  Southern District of New York, No. 1:11-CV-7387-JSR

Please check appropriate boxes:                          FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND
                                                         INJUNCTIONS PENDING APPEAL:

Has movant notified opposing counsel (required by Local Rule 27.1):     Has request for relief been made below?          o Yes   o No
    x Yes  o No (explain):_____          Has this relief been previously sought in this Court?   o Yes   o No
.                                                        Requested return date and explanation of emergency:_____
Opposing counsel's position on motion:
    o Unopposed  o Opposed  x Don't Know            _____
Does opposing counsel intend to file a response:
    o Yes  o No  x Don't Know                       _____

Is oral argument on motion requested?          x Yes     o No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?          o Yes   x No  If yes, enter date:_____

Signature of Moving Party:
 s/ Matthew G. Yeager, Ph.D._____Date: March 16 , 2012          Has service been affected?   x Yes   o No [Attach proof of service]

ORDER

IT IS HEREBY ORDERED THAT the motion is GRANTED  DENIED.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, Clerk of Court

Date: _____          By: _____

Form T-1080

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

------------------------------------------------------ x
U.S. SECURITIES AND            :
EXCHANGE COMMISSION,       :
       *Plaintiff-Appellant*,   :
                 :  No. 11-5227
     v.              :
                 :
CITIGROUP GLOBAL MARKETS INC., :
       *Defendant-Appellant.*  :
------------------------------------------------------ x

## MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF
## IN SUPPORT OF THE PUBLIC INTEREST

Prof. Matthew G. Yeager, Ph.D.
Department of Sociology
KING'S UNIVERSITY COLLEGE
at Western University Canada
266 Epworth Avenue
London, Ontario  N6A 2M3
(519) 433-3491, Ext. 4549
myeager@uwo.ca


Prof. William Calathes, J.D., Ph.D.
Department of Criminal Justice
NEW JERSEY CITY UNIVERSITY
2039 Kennedy Boulevard
Jersey City, N. J.     07305-1597
(201) 200-3492
wcalathes@njcu.edu

## MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF THE PUBLIC INTEREST

The Movants hereby request leave, pursuant to Federal Rule of Appellate Procedure 29(b) and this Court's Local Rule 29.1, to file a brief as amicus curiae in support of the public interest doctrine in this litigation, as enunciated in Judge Rakoff's decision of November 28, 2011 (here docket entry #2). Obviously, this pertains to the pending appeal by co-appellants the Securities and Exchange Commission (SEC) and Citigroup Global Markets Inc.

As this Honorable appellate court is well aware, this decision may have a dramatic impact on the future of SEC civil fraud prosecutions in major white collar crime matters, as well as the ability of the Federal judiciary to exercise discretion to review the suitability of those agreements under the public interest doctrine.*

The Academic community in North America has a longstanding interest in the study of state-corporate crime, in which much of the conduct – particularly that related to the 2008 recession and various financial frauds – is not even subject to prosecution under the penal code. Fed. R. App. P. 29(b).    The pending matter is typical of how major white collar frauds are addressed by appellant SEC.   Hence, this pattern of fraud, whether civil or criminal, is of interest to the Academic

---

*    Pursuant to Local Rule 27.1(b), we did notify counsel to the primary parties of our intent to file this motion. Amicus does not know whether any party intends to file a response, but we presume they will.

community. These type of frauds are difficult to study, particularly when the SEC and various targets negotiate "sweetheart" settlements that prevent the disclosure of documents, result in a fine that corporations write-off as a business expense, and do not allocate any funds to independent scholars to study the fraud committed by some of America's wealthiest and most powerful corporations and banks.

Where the Business Round Table asserts that the outcome of this appeal would "potentially affect most of the BRT's members," (its Amicus Motion at p. 3), we think the more significant affected parties are the millions of Americans who are quite critical of the actions of these major corporations and the favorable SEC treatment of their criminality.

Hence, we respectfully request permission to append our Amicus Brief in this pending matter (see Addendum), and with the permission of this Honorable Court, would like to address several issues:

a)  The public interest litmus test as it should apply to SEC settlements;

b)  Whether there is/was a pattern of fraud committed by major corporations;

c)  The public's view of these settlements, bringing in the Occupy Wall Street movements;

d)  The manner in which the settlement with Citigroup was negotiated, highlighting a previous relationships between counsel for both Citigroup and the SEC;  and

e) the advisability of sustaining Mr. Judge Rakoff's lower court decision to nix this particular settlement between the SEC and Citigroup.

## BACKGROUND OF MOVANTS

1. Professor Matthew G. Yeager is presently a criminologist and teaching professor in sociology and criminology at King's University College, University of Western Ontario. He has a bachelor's degree in criminology from the University of California at Berkeley (1972); a master's degree in criminal justice from the State University of New York at Albany (1975); and a doctorate in sociology from Carlton University, Ottawa, Canada (2006).

2. Prof. Yeager's original training was in theoretical criminology. He has previously taught at the Administration of Justice School, American University, Washington, D.C.; at the graduate level with the Forensic Science Department at George Washington University, Washington, D.C.; and as a lecturer and instructor at Carleton University, Ottawa, Ontario.

3. From 1981 to 1986, Prof. Yeager was a Regional Director of the National Center on Institutions and Alternatives, Alexandria, Virginia. From 1986 until 1990, he was a partner with "The Sentencing Group," a sentencing and parole consulting firm in Los Angeles, California.

4.     Professor Yeager has clinical experience in evaluating offenders in the United States and Canada.  In this regard, he has given evidence several times before Parliament on the subject of crime, gun control, the Young Offenders Act, sentencing reform and parole.  In addition to teaching duties, Dr. Yeager also maintains a small clinical practice in sentencing and parole throughout North America.  He also conducts research under contract.

5.     Dr. Yeager has previously been a Board Member of the Canadian Criminal Justice Association, and is a long-standing member of that Association's Policy Review Committee (since the early 1990's).    As well, he is a long-standing member of the American Society of Criminology since the early 1970's.

6.     Professor Yeager has been a criminologist for 40 years and has authored numerous publications in the criminal justice field.  The issue of corporate crime and sanctions is one which has engaged him since the 1980's.  See Matthew G. Yeager, "Community Redress Against the Corporate Offender" **Crime and Social Justice**  21-22 (1984): 223-227.   His most recent article, titled "The CIA made me do it: Understanding the Political Economy of Corruption in Kazakhstan" will appear in a forthcoming issue of **Crime, Law and Social Change.**   This article featured the recent U.S. District court case of **United States v. James H. Giffen** (1:03-CR-00404 WHP**).**

7.    Hence, this Third Party has a long-standing public interest in criminal justice issues as both a public intellectual and academic scholar, especially on the issue of state-corporate crime.

8.    Professor William Calathes has a distinguished record as a researcher on the subject of white collar and state crime.  He has a bachelor's degree in political science from the City College of New York (1980); a master's degree in criminal justice from the John Jay College of Criminal Justice (1983); and a doctorate in criminal justice from the Graduate School of the City of New York (1986).  He also has a law degree from the City University of New York at Queens College (1986).

9.    Professor Calathes is presently a criminologist and full professor of criminal justice at the New Jersey City University in Jersey City, New Jersey.  Among other courses, he teaches on the subject of white collar crime; and is considered an outstanding lecturer by his many students.

10.   Professor Calathes' original graduate research focused on corruption in the New York City garment industry.  His many areas of expertise include the treatment of drug offenders, the evaluation of halfway houses, the analysis of community-based alternatives to incarceration, the sentencing in death penalty cases, and the

effectiveness of firearms laws.

11.      Dr. Calathes has established himself as an international expert on state crime and human rights, lecturing on the gun court in Jamaica and the justice systems in El Salvador and the United Arab Emirates.  See Howland & Calathes, "U.N.'s International Criminal Tribunal, Is it Justice or Jingoism for Rwanda?  A Call for Transformation" **Virginia Journal of International Law** 39 (Fall 1998): 135-167. 1998).   For many years, Professor Calathes served on the Board Directors of International Rights Advocates, a non-profit organization dedicated to empowering victims of human rights abuses committed by multinational corporations worldwide.

12.   Both Professors Yeager and Calathes teach courses on the subject of white collar crime, publish in the area of state and corporate crime, and are familiar with the criminological literature in this subject area.

## CONCLUSION

Your Movants thus respectfully request that the Court grant this motion and provide standing to file other briefs as may be dictated by this Honorable Appellate Court.  As such,   your Movants request permission to participate as amicus curiae in future proceedings, if any, at both the Court of Appeal and District Court, including oral argument in this case.     Respectfully submitted,


DATED:   _16 March 2012_____          __s/ Matthew G. Yeager, Ph.D._____

Prof. Matthew G. Yeager, Ph.D.
Department of Sociology
KING'S UNIVERSITY  COLLEGE
at Western University Canada
266 Epworth Avenue
London,  Ontario   N6A 2M3
(519) 433-3491,  Ext. 4549
myeager@uwo.ca


_____ s/ William Calathes, J.D., Ph.D._____
Prof. William Calathes, J.D., Ph.D.
Department of Criminal Justice
NEW JERSEY CITY UNIVERSITY
2039  Kennedy Boulevard
Jersey City,  N. J.      07305-1597
(201) 200-3492
wcalathes@njcu.edu

# ADDENDUM

# 11-5227

# United States Court of Appeals for the Second Circuit

UNITED STATED SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellant-Cross Appellee*,

v.

CITIGROUP GLOBAL MARKETS INC.,

*Defendant-Appellee-Cross Appellant.*

On Appeal from the United States District Court
for the Southern District of New York
No. 1:11-CV-7387-JSR

## BRIEF FOR PROFESSORS AS AMICUS CURIAE IN SUPPORT OF DISTRICT COURT

Prof. Matthew G. Yeager, Ph.D.
Department of Sociology
KING'S UNIVERSITY COLLEGE
at Western University Canada
266 Epworth Avenue
London, Ontario   N6A 2M3
(519) 433-3491, Ext. 4549
myeager@uwo.ca

Prof. William Calathes, J.D., Ph.D.
Department of Criminal Justice
NEW JERSEY CITY UNIVERSITY
2039 Kennedy Boulevard
Jersey City,   N.J.    07305-1597
(201)  200-3492
wcalathes@njcu.edu

*In Propria Persona for Amicus Curiae*

# TABLE OF
# CONTENTS

<u>Page</u>

INTEREST OF AMICUS CURIAE ...........................................................................1

BRIEF FOR PROFESSORS  AS AMICUS CURIAE  IN
SUPPORT OF DISTRICT COURT.........................................................................3

CONCLUSION .....................................................................................................11

CERTIFICATE OF COMPLIANCE.......................................................................12

# TABLE OF AUTHORITIES

Page(s)

<u>Case Law</u>

EBay v. MerExchange,
   547 U.S. 388 (2006) …………………..……………………………………….. 3

Hecht Co. v. Bowles,
   321 U.S. 321  (1944)  …………………………………………………….. 4

*SEC v.* Bank of American Corporation,
   *653 F. Supp. 2d. 50  (S.D.N.Y., 2009)*……………………………………….… 3

Salinger v. Colting,
   607 F. 3d. 68, 80 (2nd Cir., 2010)    …………………………………….. 3

United States v. Morgan,
   307 U.S. 183  (1939)  …………………………………………………….. 4

Virginian Railroad Co. v. System Federation,
   300 U.S. 515 (1937)  ……………………………………………………… 4

## Other Authorities

Braithwaite, John (1984)  **Corporate Crime in the Pharmaceutical Industry**
(London:  Routledge, Kegan & Paul).

Friedrichs, David O. (2011) **Trusted Criminals: White Collar Crime in
Contemporary Society** (Belmont, California:  Wadsworth, 4th edition).

Hillyard, P., C. Pantazis, S. Tombs, & D. Gordon (eds)  [2004]  **Beyond
Criminology: Taking harm seriously**  (London:  Pluto).

Hilzebrath, David S. (2011) "Under SEC probe, Citigroup Hired former boss of top
agency official."  **Washington Post**  19 November 2011, p. A11.

Josephson, M. (1962) **The Robber Barons** (New York: Harcourt, Brace & World).

Kapner, Suzanne (2012) "Citigroup fined in U.S. Mortgage Probe" **Globe and Mail (Toronto)** 16 February 2012, p. B13.

Michalowski, Ray and Kramer, Ronald (eds) [2006] **State-Corporate Crime: Wrongdoing at the Intersection of business and government** (New Brunswick, New Jersey: Rutgers University Press).

Morgenson, Gretchen (2012) "It Has a Fancy Name, but Will It Get Tough?" **New York Times** 29 January 2012, p. B1, B3.

Pearce, Frank and S. Tombs (1998) **Toxic Capitalism and the Chemical Industry** (Aldershot: Ashgate).

Saez, Emmanuel (2012) "Striking it Richer: The Evolution of Top Incomes in the United States (Updated with 2009 and 2010 estimates)" March 2, 2012, accessed at http://elsa.berkeley.edu/~saez/saez-UStopincomes-2010.pdf.

Snider, Laureen (2000) "The Sociology of Corporate Crime: an Obituary (Or, whose knowledge claims have legs?)" **Theoretical Criminology** 4: 169-206, No. 2.

Sutherland, Edwin (1940) "White Collar Criminality" **American Sociological Review** 5 (February): 1-12, No.1.

Sutherland, Edwin (1949) **White-Collar Crime** (New York: Holt, Reinhart & Winston).

Schwendinger, Herman and Schwendinger, Julia (1970) "Defenders of Order or Guardians of Human Rights" **Issues in Criminology** 5: 123-157, No. 2.

Tombs, Steven and David Whyte (eds) [2003] **Unmasking the Crimes of the Powerful: Scutinizing states and corporations** (New York: Peter Lang).

U.S. Senate Permanent Subcommittee on Investigations. *Levin-Coburn Report on the Financial Crisis* (April 2011, 635pp.).

## INTEREST OF AMICUS CURIAE

Both professors Yeager and Calathes are members of the academic community with a historic interest in the study of state-corporate crime (Michalowski & Kramer, 2006; Sutherland, 1940, 1949; Friedrichs, 2011; Tombs & Whyte, 2003). The Academy has long held an interest in the studying modern forms of financial fraud, most particularly the recent recession-depression induced by the financial industry. Civil fraud charges against Citigroup are but the latest example of financial criminality at the highest level of the private, corporate and banking world.

Academics, especially those with expertise in state-corporate crime, have historically not intervened in fraud cases such as the matter before this Honorable tribunal. That reluctance is slowly changing with the realization that regulatory agencies such as the Securities and Exchange Commission have not protected the public interest. The Citigroup matter is a case in point.

As academics, we have a substantive interest in the legal issues presented in this case, and especially any conditions of settlement or adjudication as may take place in a future trial here in the Southern District of New York. As set forth below, we shall argue that the district court's rejection of the parties' consent decree was very much in the public interest. In fact, the proposed decree probably did not go far enough in considering other possible sanctions against Citigroup.

1

Further, we are concerned about our inability to research these patterns of criminality given the nature of the "sweet heart" agreements negotiated as consent decrees by the SEC. Hence, we respectfully disagree with the Business Roundtable's assertion that Judge Rakoff's decision could or does undermine American business commerce; and we especially disagree with the notion that major banks and corporations should not be subject to the scrutiny of the Federal Courts under the public interest doctrine. That scrutiny requires that some consent decrees be rejected from time to time.

## BRIEF FOR PROFESSORS AS AMICUS CURIAE IN SUPPORT OF DISTRICT COURT DECISION

### The Public Interest Litmus Test

Is there a public interest litmus test in SEC civil fraud settlements, and if so, of what does that "test' consist? Related to this question is whether a trial court may legally reject negotiated settlements between companies and regulatory agencies, such as the Securities and Exchange Commission.

In **SEC v. Bank of America Corporation (2009)**, 653 F. Supp. 2d. 507, 508 (S.D.N.Y), the Court specifically held that settlements of this sort are governed by the following language:

> "...whether it is within the bounds of fairness, reasonableness, and adequacy – and, in certain circumstances, whether it serves the public interest."

The courts have further attempted to define what is actually meant by the "public interest." In **EBay Inc. v. MerExchange L.L.C**. 547 U.S. 388 (2006), 126 S.Ct. 1837, 1839, the U.S. Supreme Court defined "public interest" in the context of injunctive relief – which is similar to the case at hand. Here, the Supreme Court upheld the traditional, four-factor test which includes that "the public interest would not be disserved." In a case before the Second Circuit, **Salinger v. Colting,** 607 F. 3d. 68, 80 (2010), this approach was reaffirmed.

3

Indeed, the Supreme Court of the United States previously ruled on this question in **United States v. Morgan** (1939) 307 U.S. 183, 59 S.Ct. 795, 801; and **Virginian Railroad Co. v. System Federation** (1937) 300 U.S. 515, 57 S.Ct. 592, 601.   In both cases, the right of judicial intervention by an equity court could be affected by the public interest involved.    In some circumstances, this specifically referred to the establishment of reasonable rates for stockyard services; in others, it was the peaceful settlement of a labour dispute.   In **Hecht Co. v. Bowles** (1944) 321 U.S. 321, 64 S.Ct. 587, 592, it referred to government price controls and a company's good faith attempt at compliance.

Our own view of this public interest test suggests that the criteria ought to be quite expansive, and take into consideration a variety of factors.  The criminological literature on state and corporate crime makes a persuasive argument that "social harm" ought to be included in any public interest litmus test (Sutherland, 1949; Hillyard, et.al., 2004).   Social harm can include factors which go beyond any specific dollar loss attached to a particular fraud.  This includes a pattern of conduct that contributed to (1) a major recession, (2) a de facto depression in the U.S. housing market, (3) the loss of employment and homes by many middle and lower-class American households, (4) and a growing trend of inequality in America (Saez, 2012). It is not just that CitiGroup deliberately constructed an equity investment made up of subprime mortgages and other financial products known to likely fail in the market. In point of fact, this was a pattern among various Wall Street financial corporations that contributed to near Depression-like circumstances for many Americans.   In this

instance, the SEC did not protect those "common" [ here the other 99% to invoke terminology by the Occupy Movement ] citizens, their jobs, their homes, and their meager savings from rapacious behaviour by defendants like Citigroup.

The definition of "public interest" can also include whether or not the hierarchy of a major U.S. banking establishment is effectively sanctioned, personally, for their company's conduct. It can and should include whether a banking entity guilty of civil fraud must publicly admit they committed fraud and are therefore liable civilly to other litigants. The "public interest" can include other sanctions against major corporations, to wit:

a) The use of fines to allow researchers the opportunity to study, state-corporate crime and fraud;

b) The disclosure of the investigative reports upon which the SEC negotiated their proposed settlement, or intended to disclose at a trial;

c) Forcing a major bank like Citigroup to take out advertisements in major news outlets (paper and radio), apologizing for its fraudulent behaviour, admitting guilt, and outlining steps it intends to take to prevent reoccurrences (recidivism);

    d) Putting one or more "citizen" representatives on the Board of
Directors of CITIGROUP as part of  a new external
surveillance of this scofflaw bank; and


    e) Ordering a defendant like CITIGROUP to cooperate in an
academic study of its fraudulent behaviour, thereby
facilitating interviews of bank employees and corporate
officers.


We make the above illustrations merely to point out that the public interest ought

not to be narrowly defined by the Corporate community (here the SEC, Citigroup,

and the Business Roundtable).


## A Pattern of Fraud

Citigroup is only one of several major banks and financial institutions that

have been investigated by the SEC and various law enforcement agencies.  It is now

becoming clear, based on the Senate Permanent Subcommittee of Investigations'

(2011) study of the 2008 financial debacle, that a "pattern" of fraud and risk-taking

existed among the financial industry, loosely defined.   Any definition of the "public

interest" and review by the Federal Appellate Court must take that "pattern" into

consideration.  As well, the defendant here, Citigroup, is a known recidivist, having

been sanctioned for fraud in the past (Judge Rakoff's Order of November 28, 2011,

at p.11), and having most recently agreed to pay $158.3 million dollars for submitting faulty loans to a federal mortgage insurance program (Kapner, 2012). The fact that the defendant is a recidivist must be considered in any review of the trial court's decision to reject the favorable plea bargain, and force both parties to trial.

## The Public's View of these Settlements

The Occupy Wall Street movement is only one recent manifestation of public unease over the 2008 financial meltdown. To quote *New York Times* columnist Gretchen Morgenson (2012: B1), the public has "deep suspicions that the authorities have given powerful people and institutions a pass during this awful episode." Indeed, President Obama has recently formed a Residential Mortgage-Backed Securities Working Group to address this perception, and even mentioned this issue in his State of the Union speech before a joint session of Congress. In any configuration of what constitutes the "public interest," or even a District Court's right to reject a plea agreement, the public's skepticism must be duly noted.

## Cozy Settlements

Since even the Business Roundtable admits that "virtually every large company....[has] been faced at one time or another with a government enforcement action and have had to choose whether to litigate or settle," [Its Brief at p. 1] it is

no surprise to see former SEC and Justice Department lawyers being hired by defendants to help negotiate favorable plea agreements.   As to Citigroup, we have the benefit of the SEC actually conducting an internal investigation into the relationship between Mark Pomerantz (a former Justice lawyer) and SEC head of enforcement, Mr. Robert Khuzami.   The SEC ultimately exonerated both for a perceived conflict of interest, even though the facts show that both knew each other well, and Mr. Pomerantz once supervised Mr. Khuzami when they both worked for the U.S. Justice Department.   Apparently, this reflected negotiations in 2009 that might have resulted in charging Citigroup's former chief financial officer with securities fraud.  To quote *Washington Post* journalist David Hilzenrath (2011):

> In the end, Citigroup negotiated a deal with the SEC
>
> in which it agreed to pay $75 million, neither admitted
>
> nor denied wrongdoing, and was charged with
>
> misleading investors – but not with intentional fraud.

Both CitiGroup's head of investor relations and their chief financial officer admitted violating lesser administrative regulations, and paid fines of $80,000 and $100,000, respectfully – hardly the kind of sanctions they might have faced criminally or even with civil fraud admissions.

    In this instant case, we do not have background information about how the SEC negotiated the proposed settlement with Citigroup.  However, we maintain that

background information is clearly relevant, the relationships should be exposed, and they should be made part of the public record before this District Court at trial. At the very least, we as academics would like to study this issue, among many others, illustrating the cozy nexus between banks and regulatory agencies (Michalski and Kramer, 2006).

## Affirming the District Court's Decision to Intervene

We do not intend to review various court decisions affirming the notion that courts should defer to the expertise of agencies in evaluating whether to affirm or deny agreements that require judicial intervention. In fact, there are few precedents for this situation. Instead, we take the position this exercise of judicial oversight must be influenced by the definition of what constitutes the "public interest." In the instant case, the SEC was clearly seeking Mr. Justice Rakoff's affirmation of the civil plea bargain. When are trial courts permitted to reject such plea bargains? More to the point, Judge Rackoff did not, in any way, abuse his discretion or exceed his judicial authority in rejecting the settlement. The Court of Appeals should therefore not disturb his ruling. In fact, Judge Rackoff indicated that both parties were each potentially "misleading" the court.

Here, Judge Rakoff based his denial on failure of the defendant Citigroup to admit to any facts which would justify a trial court's affirmation of the agreement. Indeed, during oral argument, Citigroup was adamant in contesting its guilt and was

9

merely agreeing to the settlement for apparently strategic reasons. It is less costly in litigation fees, it prevents more serious facts from being disclosed during trial, and it prevents other civil parties from using such a settlement as an admission of fraud in matters of civil liability.

As we noted above, there is a considerable amount of case law suggesting that the Federal Courts should defer to the expertise of government agencies when deciding whether to affirm or reject a negotiated settlement. Nevertheless, the deference to be shown the Securities and Exchange Commission is, in our humble view, misplaced. Part of the reason for Citigroup's fraudulent behavior, which contributed to the 2008-2010 recession/depression, was the failure of agencies like the SEC to spend the resources and enforcement personnel to monitor corporations and banks in the first place. Now, once these fraudulent activities have come to light, the SEC chooses to settle these prosecutions in the most favorable circumstances to the defendants (see, again, Judge Rakoff's decision of November 28, 2011, for details).

For the above reasons, we think Judge Rakoff could have gone further and objected to the terms of the settlement (see our critique above), noted that Citigroup is a recidivist, questioned the cozy relationship between the SEC and Citigroup lawyers, and allowed academics access to discovery documents so that this example of state-corporate crime can be studied in the public venue. For all of these reasons, including those put forward by the trial court, we believe this Honorable Court

10

should reject the interlocutory appeals by both the SEC and Citigroup.

## CONCLUSION

The district court's rejection of the parties' consent decree is consistent with an expanded definition of the "public interest," and should be affirmed by this Honorable Court. To do otherwise would be to grant the SEC license to not use its resources to protect the public interest and similarly to give the financial industry a near carte-blanche in its constant negotiations with regulatory agencies.

Respectfully submitted this 16th day of March, 2012.

Prof. Matthew G. Yeager, Ph.D.
Department of Sociology
KING'S UNIVERSITY COLLEGE
at Western University Canada
266 Epworth Avenue
London, Ontario    N6A 2M3
(519) 433-3491, Ext. 4549
myeager@uwo.ca


Prof. William Calathes, J.D., Ph.D.
Department of Criminal Justice
NEW JERSEY CITY UNIVERSITY
2039 Kennedy Boulevard
Jersey City, N.J.    07305-1597
(201) 200-3492
wcalathes@njcu.edu

11

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), the typeface requirement of Fed. R. App. P. 32(a)(5), and the typestyle requirements of Fed. R. App. P. 32(a)(6). This brief contains approximately 2200 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and is prepared in a proportionally spaced typeface (14-point Times New Roman).

_____/s/ *Matthew G. Yeager, Ph.D.*_____

12