# 11-5227

**11-5375, 11-5242 (CON)**

_____

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

SECURITIES AND EXCHANGE COMMISSION,
 Plaintiff-Appellant/Cross-Appellee/Petitioner,

v.

CITIGROUP GLOBAL MARKETS INC.,
 Defendant-Appellee/Cross-Appellant.
_____

On Appeal from the United States District Court
for the Southern District of New York
_____

BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION,
APPELLANT/PETITIONER
_____

MICHAEL A. CONLEY
Deputy General Counsel

JACOB H. STILLMAN
Solicitor

MARK PENNINGTON
Assistant General Counsel

JEFFREY A. BERGER
Senior Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040B
(202) 551-5112 (Berger)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.    Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.    *The Commission alleged that Citigroup violated the Securities Act by making materially misleading statements in connection with the structuring and marketing of a collateralized debt obligation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.    *The Commission submitted a proposed consent judgment for the district court's approval, along with materials establishing that the settlement was fair, reasonable, adequate, and in the public interest* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        3.    *The district court rejected the proposed consent judgment on the ground that an injunctive consent judgment is not fair, reasonable, adequate, or in the public interest unless it is supported by facts that are admitted or judicially established* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        4.    *This Court stayed the district court proceedings pending appeal* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

I.  The district court's ruling that a consent judgment imposing injunctive
    relief cannot be fair, reasonable, adequate, or in the public interest unless
    supported by admitted or judicially established facts is contrary to
    established law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    A.  Government agencies frequently resolve matters through consent
        judgments, which are judicially enforced settlements . . . . . . . . . . . 21

    B.  For over a century, courts have approved consent judgments that
        concern matters of extraordinary importance, that order wide-ranging
        injunctive relief, and that contain provisions in which defendants do
        not admit, or outright deny, the allegations in the complaint and
        liability for violations of the law . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        1.  Consent judgments without admissions are commonplace . . 25

        2.  Courts have routinely and consistently approved consent
            judgments ordering injunctive relief and concerning
            matters of public importance despite the inclusion
            of provisions in which defendants do not admit,
            or deny, the allegations and liability . . . . . . . . . . . . . . . . . . . 28

    C.  Set against this judicial practice, the district court's rule has no
        support in the law and should be reversed . . . . . . . . . . . . . . . . . . . 40

II. The district court did not give proper deference to the Commission's
    reasonable assessment that the consent judgment sufficiently satisfied its
    enforcement objectives, and the court thereby intruded upon the powers
    constitutionally entrusted to executive officials . . . . . . . . . . . . . . . . . . . . 41

    A.  The district court did not defer to the Commission's decision to enter
        into the consent judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

ii

B.      The district court's rule interferes with the Commission's allocation of resources by restricting its ability to resolve matters by consent judgment and mitigate the risk of trial . . . . . . . . . . . . . . . . . . . . . . . 46

III.   The district court abused its discretion in rejecting the consent judgment proposed here, which is fair, reasonable, adequate, and in the public interest because the Commission obtained the injunctive relief it sought in the complaint and monetary relief totaling $285 million, which is more than 80% of what it could have reasonably expected to obtain if it prevailed at trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

A.      Under the Securities Act, the maximum penalty turns on a defendant's pecuniary gain, not its size or investor losses, and the $95 million penalty ordered in the judgment is not "modest" when compared to the $160 million penalty that the Commission could have reasonably expected to obtain at trial . . . . . . . . . . . . . . . 53

B.      The district court is not permitted to evaluate the consent judgment based upon claims that the Commission did not bring . . . . . . . . . . . 54

C.      The district court is not permitted to reject the consent judgment because it does not provide "collateral estoppel assistance" to private litigants or because it does not produce adjudicated facts . . . . . . . . 55

IV.   If this Court does not exercise jurisdiction under Section 1292(a)(1), it should issue a writ of mandamus because the district court committed a clear error of law by creating a new bright-line rule regarding consent judgments that restricts the Commission's ability to settle cases . . . . . . . . . . . . . . . . . 58

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iii

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*A.B. v. Rhinebeck Central Sch. Dist.*, No. 03-3241
  (S.D.N.Y. Mar. 24, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Anita Foundations, Inc. v. ILGWU Nat'l Retirement Fund*,
  902 F.2d 185 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Arizona v. California*, 530 U.S. 392 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Board of Trade v. SEC*, 883 F.2d 525 (7th Cir. 1989) . . . . . . . . . . 7, 41, 44, 48, 49

*Carson v. American Brands, Inc.*, 450 U.S. 79 (1981) . . . . . . . . . . . 4, 5, 6, 7, 8, 9

*CFTC v. Kelly*, No. 98-5270 (JSR) (S.D.N.Y. Nov. 5, 1998) . . . . . . . . . . . . . . . 27

*CFTC v. Walsh*, 618 F.3d 218 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Cheney v. United States Dist. Ct.*, 542 U.S. 367 (2004) . . . . . . . . . . . . . . 58, 59, 60

*County of Nassau v. Leavitt*, 524 F.3d 408 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 17

*In re Cuyahoga Equip. Corp.*, 980 F.2d 110 (2d Cir. 1992) . . . . . . . . . . . . . . . . . 43

*Donovan v. Robbins*, 752 F.2d 1170 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . 6

*Durrett v. Housing Auth. of Providence*, 896 F.2d 600 (1st Cir. 1990) . . . . . . . . 6

*EEOC v. Eastman Kodak Co.,* 2006 U.S. Dist. Lexis 96433
  (W.D.N.Y. Oct. 6, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*EEOC v. Morgan Stanley & Co.*, 256 F.R.D. 124 (S.D.N.Y. 2004) . . . . . . . . . . . 39

*Evans v. Jeff D.*, 475 U.S. 717 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## TABLE OF AUTHORITIES (CONTINUED)

**Cases (Continued)**                                                    **Page**

*Firefighters Local No. 1784 v. Stotts*, 467 U.S. 561 (1984) . . . . . . . . . . . . . . . . . 26

*FTC v. American Nat'l Cellular*, 810 F.2d 1511 (9th Cir. 1987) . . . . . . . . . . . . 46

*FTC v. Countrywide Home Loans*, No. 10-4193
  (C.D. Cal. Jun. 15, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*FTC v. Diet Coffee, Inc.*, No. 08-0094 (JSR) (S.D.N.Y. Jan. 10, 2008) . . . . . . . . 27

*Grant v. Local 638*, 373 F.3d 104 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Heckler v. Chaney*, 470 U.S. 821 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 55

*Hiller v. SEC*, 429 F.2d 856 (2d Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*In re IBM Corp.*, 687 F.2d 591 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Kensington Int'l Ltd. v. Rep. of Congo*, 461 F.3d 238 (2d Cir. 2006) . . . . . . . . . . 58

*Maher v. Gagne*, 448 U.S. 122 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*New York v. Dairylea Coop., Inc.*, 698 F.2d 567 (2d Cir. 1983) . . . . . . . . . . . 7, 8, 9

*New York State Law Dep't v. FCC*, 984 F.2d 1209 (D.C. Cir. 1993) . . . . . . . . . . 43

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) . . . . . . . . . . . . . . . . . . . . . . 47

*Sam Fox Publ'g Co. v. United States*, 366 U.S. 683 (1961) . . . . . . . . . . . . . . . . . 42

*Schlagenhauf v. Holder,* 379 U.S. 104 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*SEC v. ABB Ltd.*, No. 10-1648 (D.D.C. Oct. 12, 2010) . . . . . . . . . . . . . . . . . . . . 31

## TABLE OF AUTHORITIES (CONTINUED)

**Cases (Continued)**                                                                   **Page**

*SEC v. Accornero*, No. 01-6452 (JSR) (S.D.N.Y. Jul. 20, 2001) . . . . . . . . . . . . . 26

*SEC v. AIG*, No. 06-1000 (S.D.N.Y. Feb. 17, 2006) . . . . . . . . . . . . . . . . . . . . . . . 30

*SEC v. Alcatel-Lucent, SA*, No. 10-24620 (S.D. Fla. Dec. 30, 2010) . . . . . . . . . . 31

*SEC v. Alexander*, No. 06-3844 (E.D.N.Y. Nov. 30, 2011) . . . . . . . . . . . . . . . . . 31

*SEC v. Blinder, Robinson & Co.*, 855 F.2d 677 (10th Cir. 1988) . . . . . . . . . . . . . 46

*SEC v. Citigroup Global Markets, Inc.*,
   673 F.3d 158 (2d Cir. 2012) . . . . . . . . . . . . . . 4, 6, 7, 9, 25, 45, 47, 48, 51, 57, 60

*SEC v. Citigroup Inc.*, No. 10-1277 (D.D.C. Oct. 8, 2010) . . . . . . . . . . . . . . . . . 31

*SEC v. Clifton*, 700 F.2d 744 (D.C. Cir. 1983) . . . . . . . . . . . . . . . 22, 23, 48, 56, 57

*SEC v. Collins*, No. 07-11343 (JSR) (S.D.N.Y. Jun. 10, 2010) . . . . . . . . . . . . . . 26

*SEC v. Diebold, Inc.*, No. 10-908 (D.D.C. Jun. 14, 2010) . . . . . . . . . . . . . . . . . . 31

*SEC v. Ebbers*, No. 05-6378 (JSR) (S.D.N.Y. Jul. 22, 2005) . . . . . . . . . . . . . . . 26

*SEC v. ENI, S.p.A*, No. 10-2414 (S.D. Tex. Jul. 20, 2010) . . . . . . . . . . . . . . . . . 31

*SEC v. Everest Mgmt. Corp.*, 475 F.2d 1236 (2d Cir. 1972) . . . . . . . . . . . . . . . . 24

*SEC v. FNMA*, No. 06-959 (D.D.C. Aug. 9, 2006) . . . . . . . . . . . . . . . . . . . . . . . 30

*SEC v. Forest Resources Mgmt. Corp.*, No. 09-903 (JSR)
   (S.D.N.Y. Mar. 30, Apr. 29, Oct. 15, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*SEC v. General Elec. Co.*, No. 10-1258 (D.D.C. Jul. 30, 2010) . . . . . . . . . . . . . . 31

## TABLE OF AUTHORITIES (CONTINUED)

**Cases (Continued)**                                                          **Page**

*SEC v. Goldman, Sachs & Co.*, No. 10-3229 (S.D.N.Y. Jul. 20, 2010) . . . . . . . . 31

*SEC v. Gulkin*, No. 03-9813 (JSR) (S.D.N.Y. Dec. 12, 2003) . . . . . . . . . . . . . . . 26

*SEC v. Johnson & Johnson*, No. 11-686 (D.D.C. Apr. 13, 2011) . . . . . . . . . . . . . 31

*SEC v. JP Morgan Secs. LLC*, No. 11-3877 (D.N.J. Jul. 7, 2011) . . . . . . . . . . . 31

*SEC v. Myers*, No. 02-7749 (JSR) (S.D.N.Y. Nov. 15, 2002) . . . . . . . . . . . . . . . 26

*SEC v. Pequot Capital Mgmt.*, No. 10-831 (D. Conn. Jun. 2, 2010) . . . . . . . . . . 31

*SEC v. Platinum Investment Corp.*, No. 02-6093 (JSR)
  (S.D.N.Y. Aug. 12 & Oct. 15, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*SEC v. Rajaratnam*, 622 F.3d 159 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 58, 59

*SEC v. Randolph*, 736 F.2d 525 (9th Cir. 1984) . . . . . . . . . . . . . . . . . 17, 18, 41, 48

*SEC v. Saad*, No. 05-3308 (JSR) (S.D.N.Y. May 18, 2005 &
  Jul. 31, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*SEC v. Technip*, No. 10-2289 (S.D. Tex. Jul. 9, 2010) . . . . . . . . . . . . . . . . . . . . . 31

*SEC v. UBS Fin. Servs.*, No. 11-2539 (D.N.J. May 6, 2011) . . . . . . . . . . . . . . . . 31

*SEC v. Vinson*, No. 02-8083 (JSR) (S.D.N.Y. Nov. 26, 2002) . . . . . . . . . . . . . . . 26

*SEC v. Wang*, 944 F.2d 80 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . 18, 23, 24, 42

*SEC v. WorldCom*, No. 02-4963 (JSR) (S.D.N.Y. Nov. 26, 2002
  & Jul. 7, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

vii

## TABLE OF AUTHORITIES (CONTINUED)

**Cases (Continued)**                                                    **Page**

*SEC v. WorldCom, Inc.*, 273 F. Supp. 2d 431 (S.D.N.Y. 2003) . . . . . . . . . . . . . . 30

*SEC v. Yates*, No. 02-7958 (JSR) (S.D.N.Y. Nov. 15, 2002) . . . . . . . . . . . . . . . 26

*Sierra Club, Inc. v. Electronic Controls Design, Inc.*, 909 F.2d 1350
  (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Sims*, 534 F.3d 117 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Smith*, 926 F.2d 1027 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264 (8th Cir. 2011) . . . . . . . . . . . . . 44

*Stein v. KPMG, LLP*, 486 F.3d 753 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 60

*Suter v. Artist M.*, 503 U.S. 347 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Swift & Co. v. United States*, 276 U.S. 311 (1928) . . . . . . . . . . . . . . . . . . 25, 26, 32

*In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201 (3d Cir. 1993) . . . . . . . . . 43

*In re United States*, 503 F.3d 638 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Abbott Laboratories*, No. 99-7135
  (N.D. Ill. Nov. 2, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*United States v. Airline Tariff Publ'g Co.*, 1994 U.S. Dist. Lexis 11904
  (D.D.C. Aug. 10, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Akzo Coatings of Am., Inc.*,
  949 F.2d 1409 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Albank FSB*, No. 97-1206 (W.D.N.Y. Aug. 13, 1997) . . . . . . . . 39

## TABLE OF AUTHORITIES (CONTINUED)

**<u>Cases (Continued)</u>** **<u>Page</u>**

*United States v. American Coal Prods. Co.*, No. 10-124
    (S.D.N.Y. Mar. 4, 1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. American Electric Power Serv. Corp.*, No. 99-1250
    (S.D. Ohio Oct. 9, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Armour & Co.*, 402 U.S. 673 (1971) . . . . . . . . . . . . . . . 22, 26, 48

*United States v. Atlantic Refining Co.*, 360 U.S. 19 (1959) . . . . . . . . . . . . . . . 26

*United States v. AT&T*, 552 F. Supp. 131 (D.D.C. 1982), *aff'd sub nom.*
    *Maryland v. United States*, 460 U.S. 1001 (1983) . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. BNS Inc.*, 858 F.2d 456 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . 43

*United States v. Board of Educ. of Chicago*, 88 F.R.D. 679
    (N.D. Ill. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. BP Prods. North America Inc.*, No. 10-3569
    (S.D. Tex. Sept. 30, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. CBS*, 1980 U.S. Dist. Lexis 14679 (C.D. Cal. Jul. 3, 1980) . . . 33

*United States v. Cannons Eng'g Corp.*, 899 F.2d 79 (1st Cir. 1990) . . . . . . . . . 42

*United States v. Caterpillar, Inc.*, No. 98-02544 (D.D.C. Jul. 1, 1999) . . . . . . . . 35

*United States v. Caterpillar, Inc.*, 2002 U.S. Dist. Lexis 468
    (D.D.C. Jan. 17, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*United States v. Choicepoint, Inc.*, No. 06-0198
    (N.D. Ga. Feb. 15, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

ix

## TABLE OF AUTHORITIES (CONTINUED)

**Cases (Continued)**                                                    **Page**

*United States v. City of Hialeah*, 140 F.3d 968 (11th Cir. 1998)  . . . . . . . . 6, 17, 44

*United States v. City of Los Angeles*, No. 00-11769
  (C.D. Cal. Jun. 15, 2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. City of New York*, No. 04-2248
  (E.D.N.Y. Jun. 1, 2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Colorado*, 937 F.2d 505 (10th Cir. 1991)  . . . . . . . . . . . . . . . . . . 6

*United States v. George A. Whiting Paper Co.*, 644 F.3d 368
  (7th Cir. 2011)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Hillman Housing Corp.*, No. 02-0626
  (S.D.N.Y. Oct. 27, 2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Inova Health Sys.*, No. 10-714
  (E.D. Va. Mar. 30, 2011)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. ITT Continental Baking Co.*, 420 U.S. 223 (1975)  . . . . . . . . 22, 25

*United States v. Kansas City*, No. 10-0497
  (W.D. Mo. May 18, 2010)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Koch Indus.*, No. 95-1118 (S.D. Tex. Jan. 13, 2000)  . . . . . . . . . 36

*United States v. Lexington-Fayette Urban County Gov't*,
  591 F.3d 484 (6th Cir. 2010)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Massey Energy Co.*, No. 07-299
  (S.D. W.Va. Jan. 17, 2008)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

x

## TABLE OF AUTHORITIES (CONTINUED)

**Cases (Continued)**                                                    **Page**

*United States v. Metro. St. Louis Sewer Dist.*, No. 07-1120
   (E.D. Mo. Aug. 4, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Microsoft Corp.*, No. 94-1564 (D.D.C. Jul. 15, 1994) . . . . . . . 32

*United States v. Microsoft Corp.*,
   56 F.3d 1448 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 6, 31, 32, 45, 46, 54, 55

*United States v. NCAA*, No. 98-1290 (D.D.C. May 27, 1998) . . . . . . . . . . . . 38, 39

*United States v. New Jersey*, No. 99-5970 (D.N.J. Dec. 30, 1999) . . . . . . . . . . . 37

*United States v. New Puck, LP*, No. 04-5449 (JSR)
   (S.D.N.Y. Jul. 14, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. North Carolina*, 180 F.3d 574 (4th Cir. 1999) . . . . . . . . . . . . . . . 6

*United States v. Northeast Ohio Regional Sewer Dist.*, No. 10-02895
   (N.D. Ohio Dec. 22, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Osceola County*, No. 02-738 (M.D. Fla. Jul. 22, 2002) . . . . . . . 38

*United States v. Otis Elevator Co.*, No. 13884 (N.D. Cal. Jun. 1, 1906) . . . . . . . 32

*United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948) . . . . . . . . . . . . . 26

*United States v. Salem County*, No. 08-03276 (D.N.J. Jul. 28, 2008) . . . . . . . . . 38

*United States v. Schering-Plough Corp.*, No. 02-2397
   (D.N.J. May 20, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. The New Departure Mfg. Co.*, No. 48-A
   (W.D.N.Y. May 27, 1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# TABLE OF AUTHORITIES (CONTINUED)

*Van Cook v. SEC*, 653 F.3d 130 (2d Cir. 2011), *cert. denied*,
132 S. Ct. 1582 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

## Statutes

Securities Act of 1933, 15 U.S.C. 77a, et seq.

Section 17(a)(2), 15 U.S.C. 77q(a)(2) . . . . . . . . . . . . . . . . . . . . . 3, 12, 50, 51

Section 17(a)(3), 15 U.S.C. 77q(a)(3) . . . . . . . . . . . . . . . . . . . . . 3, 12, 50, 51

Section 20(d)(2), 15 U.S.C. 77t(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Section 22(a), 15 U.S.C. 77v(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.

Section 21(g), 15 U.S.C. 78u(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

15 U.S.C. 16(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

28 U.S.C. 1292(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 6, 10, 58

28 U.S.C. 1651(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Commission Rule of Practice

Rule 202.5(e), 17 C.F.R. 202.5(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

## Miscellaneous

Andrew Ackerman & Jean Eaglesham, *SEC Pushes to Toughen Penalties*
*for Offenders*, WALL ST. J., Nov. 30, 2011, at C1 . . . . . . . . . . . . . . . . . . . 53, 54

BLACK'S LAW DICTIONARY (6th ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**TABLE OF AUTHORITIES (CONTINUED)**

<u>**Miscellaneous (Continued)**</u>                                                        <u>**Page**</u>

Richard A. Epstein, ANTITRUST CONSENT DECREES IN THEORY AND
    PRACTICE (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

3 A.C. Freeman, A TREATISE ON THE LAW OF JUDGMENTS
    (5th ed. 1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 27

H.R. REP. NO. 93-1463 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

1 Talbot S. Lindstrom & Kevin P. Tighe, ANTITRUST CONSENT DECREES
    (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 32

Acting Principal Deputy Assistant Attorney General John M. Nannes,
    *Termination, Modification, and Enforcement of Antitrust Consent*
    *Decrees*, 15 ANTITRUST 55 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Robert V. Percival, *The Bounds of Consent: Consent Decrees,*
    *Settlements and Federal Environmental Policy Making*,
    1987 U. CHI. LEGAL F. 327 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Judith Resnik, *Judging Consent*, 1987 U. CHI. LEGAL F. 43 (1987) . . . . . . . . 21, 22

RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982) . . . . . . . . . . . . . . . . . . . . . 27

S. REP. NO. 93-298 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

S. REP. NO. 94-74 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Seth Schiesel & Simon Romero, *WorldCom strikes a deal with the SEC*,
    N.Y. TIMES, Nov. 27, 2002, at C5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Kristi Smith, *Who's Suing Whom: A Comparison of Government and Citizen Suit*
    *Environmental Actions Brought Under EPA-Administered Statutes, 1995-2000*,
    29 COLUM J. ENVTL. L. 359, 387 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

## TABLE OF AUTHORITIES (CONTINUED)

**Miscellaneous (Continued)**                                                    **Page**

Statement of Robert Khuzami (Jan. 7, 2012), *available at*
   http://www.sec.gov/news/speech/2012/spch010712rsk.htm . . . . . . . . . . . . . . . . 48

United States EEOC, *Office of the General Counsel, Fiscal Year 2009 Annual
   Report* (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States FTC, *The FTC in 2010* (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18A Charles A. Wright and Arthur R. Miller, FEDERAL PRACTICE AND
   PROCEDURE § 4443 (2d ed. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

11-5277

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT
_____

SECURITIES AND EXCHANGE COMMISSION,
Plaintiff-Appellant/Cross-Appellee/Petitioner,

v.

CITIGROUP GLOBAL MARKETS INC.,
Defendant-Appellee/Cross-Appellant.
_____

On Appeal from the United States District Court
for the Southern District of New York
_____

BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION,
APPELLANT/PETITIONER
_____

## INTRODUCTION

To resolve charges that Citigroup Global Markets Inc. violated the antifraud provisions of the Securities Act of 1933, the Securities and Exchange Commission and Citigroup entered into a consent judgment that imposed injunctive and monetary relief. Citigroup consented to this relief without admitting or denying the allegations in the complaint. The district court rejected the consent judgment, holding that it was not fair, reasonable, adequate, or in the public interest because it was not based on "facts, established by either admissions or by trials." SPA 15.

The district court's order, which this Court has jurisdiction to review under either 28 U.S.C. 1292(a)(1) or its mandamus authority, should be reversed. It rests on the broad holding that an injunctive consent judgment cannot be approved "on the basis of allegations unsupported by any proven or acknowledged facts." SPA 14. Such a bright-line rule is erroneous. For over a century, courts have approved thousands of consent judgments that impose substantial injunctive relief based solely on allegations in complaints filed by federal government agencies. In doing so, they have given substantial deference to the agencies' decisions to settle on those terms. The district court, by contrast, failed to give any real deference to the Commission's judgment that the consent judgment served the public interest, and the court thus intruded upon the executive power vested in the Commission.

The district court rejected the consent judgment because, in essence, it disagreed with the Commission's policy of entering into consent judgments without obtaining admissions from defendants. But it is not the court's role to dictate how the Commission should settle its cases, particularly when the Commission obtained in settlement most of what it could have obtained at trial without any litigation risk and without consuming the Commission's finite resources. The district court's justifications for rejecting the consent judgment constituted an abuse of its discretion, and this Court should accordingly vacate the

2

district court's order and remand with instructions to enter the consent judgment as proposed.

## STATEMENT OF JURISDICTION

The Commission alleged that Citigroup violated Sections 17(a)(2) and (3) of the Securities Act of 1933, 15 U.S.C. 77q(a)(2)–(3). JA 14–34. The district court exercised jurisdiction pursuant to Section 22(a) of the Securities Act, 15 U.S.C. 77v(a).

At the same time it filed its complaint, the Commission presented a consent judgment to the district court for approval. In addition to requiring Citigroup to pay $285 million, the judgment ordered prohibitory injunctive relief (permanently enjoining Citigroup from further violations of the charged provisions of the Securities Act) and mandatory injunctive relief (requiring Citigroup to change its policies for creating and selling certain securities). JA 42–51. The district court rejected the proposed consent judgment on November 28, 2011, stating that "the injunctive power of the judiciary" cannot be deployed if it "does not rest on facts—cold, hard, solid facts, established either by admissions or by trials." SPA 14–15. The court further directed the parties to prepare for trial. SPA 15.

The Commission filed a timely notice of appeal on December 15, 2011, JA 248–51, and Citigroup filed a timely notice of appeal on December 21, 2011, JA

3

271–72.  The Commission separately petitioned for a writ of mandamus on

December 29, 2011.  JA 290–93.  This Court stayed the district court proceedings

pending resolution of the appeals and the mandamus petition, finding that the

Commission had shown "a strong likelihood of success" on the merits and satisfied

the other prerequisites for a stay.  *SEC v. Citigroup Global Markets, Inc.*, 673 F.3d

158, 166 (2d Cir. 2012) (per curiam) (*Citigroup Stay Order*), reprinted JA 301–17.

     This Court has jurisdiction to review the district court's order pursuant to 28

U.S.C. 1292(a)(1), which authorizes appeals from "[i]nterlocutory orders of the

district courts * * * refusing * * * injunctions."  The district court refused the

Commission's request for "wide-ranging injunctive remedies" enforced by "the

formidable power of contempt."  SPA 8.  The court's refusal to "deploy[] the

"injunctive power of the judiciary" was central to its decision; the court stated that

a request for "substantial injunctive relief, enforced by the Court's own contempt

power, on the basis of allegations unsupported by any proven or acknowledged

facts" is not "in the public interest."  SPA 14–15.  Under the "plain terms" of

Section 1292(a)(1), such an order is immediately appealable without showing that

the refusal had a "'serious consequence.'"  *CFTC v. Walsh*, 618 F.3d 218, 224 (2d

Cir. 2010), citing *Carson v. American Brands, Inc.*, 450 U.S. 79 (1981) ("*Carson*

4

does not impose an additional 'serious consequence' requirement for appellate jurisdiction over orders that explicitly * * * refuse * * * injunctions.").

At the very least, the order is immediately appealable because it "had the practical effect" of refusing an injunction and satisfied *Carson's* "serious consequence" test. 450 U.S. at 83. If the order were not "immediately appealable," it would have a "'serious, perhaps irreparable, consequence'" for the Commission and Citigroup—the loss of their right "to compromise their dispute on mutually agreeable terms." *Id*. at 86. Consent judgments are "predicated on an express or implied condition that the parties would, by their agreement, be able to avoid the costs and uncertainties of litigation." *Id*. at 87. The denial of the consent judgment—and the order to prepare for trial—would "radically affect" that condition. *Id*.

This case is directly in line with *Carson*, where a district court had rejected a proposed consent judgment requiring the defendants to undertake certain hiring reforms so as to prevent racial discrimination. *Id.* at 81. The district court had refused to "enter any decree containing remedial relief provisions that did not rest solidly on evidence of discrimination." *Id*. at 87 n.12, citing 446 F. Supp. 780, 788–90 (E.D. Va. 1977). Because the district court had "made clear that nothing short of an admission of discrimination" would allow it to approve the consent

judgment, the Supreme Court held that the district court order had a "'serious, perhaps irreparable, consequence'"—it "effectively ordered the parties to proceed to trial and to have their respective rights and liabilities established within limits laid down by that court." *Id*. at 87 & n.12. Section 1292(a)(1) authorized an appeal, the Supreme Court held, because the district court had "effectively foreclosed" the parties' "opportunity to settle their case on the negotiated terms." *Id*. at 86, 87 n.12, 90.[1]

Applying *Carson,* this Court has jurisdiction. The district court's order, which rejected the proposed consent judgment and directed the parties to proceed to trial, had the "practical effect" of denying the injunctive relief. The district court did not afford the parties any opportunity "to return to the bargaining table to make reasonable adjustments of terms of settlement." *Citigroup Stay Order*, 673 F.3d at 166. Rather, like the district court in *Carson*, the district court here "made clear," 450 U.S. at 87 n.12, that any revised proposal would be rejected unless it was

---

[1] Numerous courts have relied on *Carson*'s interpretation of Section 1292(a)(1) and found that they had jurisdiction to review interlocutory orders rejecting injunctive consent judgments. *United States v. North Carolina*, 180 F.3d 574, 577 n.2 (4th Cir. 1999); *United States v. City of Hialeah*, 140 F.3d 968, 973–75 (11th Cir. 1998); *United States v. Microsoft Corp.*, 56 F.3d 1448, 1456–57 (D.C. Cir. 1995); *United States v. Colorado*, 937 F.2d 505, 507–09 (10th Cir. 1991); *Sierra Club, Inc. v. Electronic Controls Design, Inc.*, 909 F.2d 1350, 1353–54 (9th Cir. 1990); *Durrett v. Housing Auth. of Providence*, 896 F.2d 600, 602 (1st Cir. 1990); *Donovan v. Robbins*, 752 F.2d 1170, 1176 (7th Cir. 1985).

based on "cold, hard, solid facts, established either by admissions or by trials,"

SPA 14–15, a posture that "virtually preclude[d] the possibility of settlement,"

*Citigroup Stay Order*, 673 F.3d at 166.

By denying the Commission and Citigroup the right to end the litigation on

"mutually agreeable terms," the district court's order will have a "serious, perhaps

irreparable, consequence." *Carson*, 450 U.S. at 86. It will force the Commission

to incur the costs and bear the risks of a trial that would not occur if the consent

judgment were approved. *See infra* p. 45–50. This is the precise harm that the

Court identified in *Carson*, although it is amplified here because the expenditure of

resources on this case is the deprivation of resources from another. *Board of Trade*

*v. SEC*, 883 F.2d 525, 531 (7th Cir. 1989).[2]

This Court's decisions in *Grant* and *Dairylea* do not command a different

result. Those decisions "are substantially different," and the district court's order

"rejecting the proposed settlement is far more similar to that in *Carson* than that in

*Grant* and in *Dairylea*." *Citigroup Stay Order*, 673 F.3d at 166, 168, citing *New*

---

[2] The district court consolidated this case with *SEC v. Stoker*, a related action. SPA 15. While these two cases are based on the same operative facts, the Commission will have to expend additional resources to prepare for trial against Citigroup, which has identified additional witnesses that Stoker did not identify and may identify expert witnesses separate from any experts that Stoker identifies. Deposing these witnesses, and preparing any rebuttal witnesses, will consume additional resources.

*York v. Dairylea Coop., Inc.*, 698 F.2d 567 (2d Cir. 1983); *Grant v. Local 638*, 373 F.3d 104, 108 (2d Cir. 2004).

In *Dairylea*, New York officials entered into a settlement resolving charges that a defendant had violated the antitrust laws. Other similarly charged defendants objected, asserting that the proposed relief was itself anticompetitive, and the district court rejected the settlement. *Id.* at 569. On appeal, this Court concluded that it lacked jurisdiction and distinguished *Carson* on several grounds. The Court held that the parties did not show "serious, irreparable harm" because the district court "explicitly expressed a willingness to consider further proposals," and the parties were "free to return to the bargaining table" to devise a different settlement. *Id.* at 570. The Court further noted that the proposed consent judgment merely enjoined a party from "violating the law." *Id.* And the Court explained that the agreement would not have terminated the litigation because it did not resolve the charges against the other defendants. *Id.* at 571.

The characteristics that distinguished *Dairylea* from *Carson* do not exist here. Like the district court in *Carson*, the district court here "made clear that nothing short of an admission" would suffice. *Compare* SPA 14 *with Carson*, 450 U.S. at 87 n.12; *see also Grant*, 373 F.3d at 111 (emphasizing that "the *Carson* court relied heavily on the district court's warning that it would never approve a

8

settlement similar to the one the parties made"). Thus, the district court's rejection "cannot be cured by the parties returning to the bargaining table to make relatively minor adjustments to the terms of the settlement." *Citigroup Stay Order*, 673 F.3d at 168. In any event, the district court did not express any willingness to consider further proposals; it directed the Commission and Citigroup to prepare for trial. As another point of distinction from *Dairylea*, the proposed consent judgment here not only enjoined the defendant from further violations of the law, but also required, as in *Carson*, that the defendant undertake certain business reforms to prevent future violations. Finally, whereas an approved settlement in *Dairylea* would not have ended the litigation, the consent decree here—like that in *Carson*—would terminate the action, dissipating the concerns about piecemeal appeals that motivated the Court in *Dairylea*. *See* 698 F.2d at 570–71.

*Grant*, in which the district court rejected a proposed modification of a decades-old injunction, also features differing circumstances. 373 F.3d at 106. This Court distinguished *Carson* on the ground that the district court did not "effectively foreclose the parties from negotiating a settlement modifying the previously existing injunction." *Id*. at 108–09. The district court "made no comments similar to those of the district court in *Carson*," and there was "no indication that it would never allow a modification of injunctive relief similar to

9

that in the proposed consent decree." *Id*. By contrast, the district court here clearly indicated that it would not approve an injunctive consent judgment in the absence of facts "established either by admissions or by trials." SPA 15.

Accordingly, under Section 1292(a)(1) and *Carson,* this Court has jurisdiction over this appeal. If the court holds that it lacks jurisdiction under 1292(a)(1), it will have jurisdiction to issue a writ of mandamus pursuant to 28 U.S.C. 1651(a). *See infra* Section IV.

## ISSUES PRESENTED

The Commission presented the district court with a proposed consent judgment pursuant to which Citigroup, without admitting or denying the allegations in the complaint, agreed to pay $285 million (in disgorgement, interest, and penalties), to be enjoined from violating the charged provisions of the Securities Act, and to implement a series of business reforms. The district court refused to approve the consent judgment because it held that a consent judgment imposing injunctive relief is not fair, reasonable, adequate, or in the public interest unless it is supported by admitted or judicially "established" facts. The issues presented are:

(1)      Whether the district court erred by creating a bright-line rule that an injunctive consent judgment must be rejected unless it is based on facts

10

"established by admissions or by trials," a rule that conflicts with a century of judicial practice and intrudes upon the Commission's executive authority.

(2)     Whether the district court exceeded its discretion when it rejected the proposed consent judgment as not fair, reasonable, adequate, or in the public interest after the Commission had reasonably decided that the consent judgment provided sufficient relief to achieve the Commission's objectives of protecting investors while avoiding the risks posed by litigation.

(3)     Whether, if the Court rules that it lacks jurisdiction under Section 1292(a)(1), it should grant the Commission's petition for a writ of mandamus and order the district court to enter the consent judgment as proposed.

## STATEMENT OF THE CASE

### A.     Nature of the Case

The Commission filed a complaint alleging that Citigroup violated the antifraud provisions of the Securities Act of 1933.  On the same day, the Commission filed a proposed consent judgment that permanently enjoined Citigroup from further violations of those antifraud provisions, ordered it to institute a series of business reforms, and required it to pay $285 million.  The district court rejected the consent judgment in an order that the Commission now appeals.

11

## B.   Statement of Facts

1.   *The Commission alleged that Citigroup violated the Securities Act by making materially misleading statements in connection with the structuring and marketing of a collateralized debt obligation.*

Following an extensive investigation of Citigroup's marketing of collateralized debt obligations (CDOs), the Commission filed a detailed complaint charging Citigroup with violating Sections 17(a)(2) and (3) of the Securities Act of 1933, 15 U.S.C. 77q(a)(2), (3), in connection with a CDO called Class V Funding III.  JA 14 (¶ 1).[3]  Class V's portfolio consisted of credit default swaps that referenced other CDO securities backed by residential mortgage-backed securities.  Thus, Class V's value was tied to the fortunes of the U.S. residential housing market.  *Id.*

The complaint alleged that the marketing materials for Class V were materially misleading in two interrelated ways.  First, the materials represented that

---

[3] Sections 17(a)(2) and (3) make it unlawful "for any person in the offer or sale of any securities":

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

12

a third party selected the underlying investment portfolio—a statement likely to facilitate investment in Class V—even though Citigroup had significantly influenced the selection of half the assets in Class V. JA 15, 21–23, 26–29 (¶¶ 2, 20, 24–34, 39–46). Second, the materials did not disclose that Citigroup established a short position on the $500 million in assets that it helped select and from which it stood to profit if the assets performed poorly. JA 15, 21–23, 28–29 (¶¶ 2, 19–23, 27, 43–46).

Citigroup began to offer Class V investments in January 2007, distributing materials containing these misrepresentations to several institutional clients. JA 29 (¶ 47). The Class V transaction closed on February 28, 2007. JA 29–30, 33 (¶¶ 48, 52, 63). In November 2007, Class V declared a default event. JA 32 (¶¶ 59, 61). The Commission alleged that Citigroup received ill-gotten gains of $160 million in connection with Class V. JA 33 (¶ 63).

> ### 2. The Commission submitted a proposed consent judgment for the district court's approval, along with materials establishing that the settlement was fair, reasonable, adequate, and in the public interest.

On the same day that the Commission filed its complaint, it submitted a proposed consent judgment to the district court. "Without admitting or denying the allegations of the complaint," Citigroup consented to the entry of a final judgment that ordered three forms of relief. JA 42. First, the judgment permanently

13

enjoined Citigroup from violating the provisions of the Securities Act cited in the complaint.  JA 42, 54–55.  Second, it ordered Citigroup to disgorge $160 million, pay $30 million in pre-judgment interest, and pay a $95 million penalty—all of which would be placed into a Fair Fund for injured investors.  JA 42–43, 55–57.  Third, it ordered Citigroup to fortify its approval processes for initial offerings of residential mortgage-related securities, to enhance the role of legal counsel and compliance officers in reviewing the marketing materials for such securities, and to demonstrate its compliance with these undertakings by submitting to audits and to monitoring by the Commission.  JA 43, 57–59.

The district court scheduled a hearing to determine "whether the proposed judgment is fair, reasonable, adequate, and in the public interest."  JA 68.  In advance of the hearing, the Commission provided detailed answers to nine questions that the district court had posed about the consent judgment.  JA 72–107.  The Commission explained that the proposed consent judgment reasonably reflected the scope of relief likely to be obtained by the Commission if successful at trial when taking into account several factors, including: litigation risk; the benefits of avoiding that risk; Citigroup's unwillingness to settle while admitting the factual predicates of the Commission's claims; the opportunity to detail

14

publicly the Commission's factual conclusions; and the allocation of resources among the Commission's many enforcement actions.

In response to the court's question about how the proposed relief compared to the amount of investor loss, the Commission described the difficulty in calculating such losses and explained that, unlike private litigants, the Commission need not prove the amount of losses caused by the wrongdoing. The Commission nevertheless estimated that investor losses likely exceeded $700 million, but emphasized that it based the $285 million in the proposed consent judgment on the only remedies available under law: disgorgement of ill-gotten gains and a civil penalty that cannot exceed such gain. JA 94–96.

3. *The district court rejected the proposed consent judgment on the ground that an injunctive consent judgment is not fair, reasonable, adequate, or in the public interest unless it is supported by facts that are admitted or judicially established.*

The district court rejected the consent judgment. The court stated in its order that it could not approve the proposed consent judgment and deploy the injunctive power of the court—backed by the threat of contempt—when the court had "not been provided with any proven or admitted facts upon which to exercise even a modest degree of independent judgment." SPA 6. This asserted absence of "a sufficient evidentiary basis" was a major component of the court's conclusion that the proposed consent judgment was "neither fair, nor reasonable, nor adequate,

15

nor in the public interest." SPA 8. The court emphasized that it needed "some knowledge of what the underlying facts are" because without such facts "the public is deprived of ever knowing the truth in a matter of obvious public importance," and investors "attempting to recoup their losses through private litigation" cannot "derive any collateral estoppel assistance" from the consent judgment. SPA 8–9, 12.

The district court thus held that a consent judgment cannot be approved where "it asks the Court to impose substantial injunctive relief, enforced by the Court's own contempt power, on the basis of allegations unsupported by any proven or acknowledged facts whatsoever." SPA 14 ("[H]ow can it ever be reasonable to impose substantial relief on the basis of mere allegations?"). Instead, the court stated, the "deployment" of injunctive power must rest on "cold, hard, solid facts, established either by admissions or by trials." SPA 15.

    4.    *This Court stayed the district court proceedings pending appeal.*

The Commission appealed. Because the court directed the parties to prepare for trial, the Commission moved in the district court to stay the proceedings, which denied the motion, and again in this Court, which granted the motion. After considering "the various explanations given by the district court for its refusal to permit the settlement," this Court held that the Commission had "made a strong

16

showing of likelihood of success in setting aside the district court's rejection of [the] settlement, either by appeal or petition for mandamus."  673 F.3d at 166, 169. The Court found it "doubtful whether the [district] court gave the obligatory deference to the [Commission's] views in deciding that the settlement was not in the public interest."  *Id*. at 165.  And the Court stated that it knew "of no precedent that supports the proposition that a settlement will not be found to be fair, adequate, reasonable, or in the public interest unless liability has been conceded or proved and is embodied in the judgment."  *Id*. at 166.  The Court further held that the Commission satisfied the other prerequisites for a stay because (1) the Commission and Citigroup would "incur significant harm absent a stay if they are prevented from settling their dispute and ordered to prompt trial," (2) there was "no appreciable harm to anyone from issuing a stay," and (3) the stay was "in the public interest."  *Id*. at 166–68.

## STANDARD OF REVIEW

This Court reviews the district court's rejection of the proposed consent judgment for an abuse of discretion, and it reviews the underlying legal conclusions de novo.  *SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984); *County of Nassau v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008); *United States v. City of Hialeah*, 140 F.3d 968, 973 (11th Cir. 1998).  A court abuses its discretion when,

17

among other things, its bases "its ruling on an erroneous view of the law" or renders a decision that "cannot be located within the range of permissible decisions." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008). The district court's discretion is circumscribed here by the deference that it must give to "the government agency which has negotiated and submitted the proposed judgment." *Randolph*, 736 F.2d at 529; *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991).

## SUMMARY OF ARGUMENT

The district court's order should be reversed because it is premised on an erroneous rule of law. In rejecting the proposed consent judgment, the district court held that a consent judgment containing injunctive relief cannot be fair, reasonable, adequate, or in the public interest unless it rests on "facts, established by either admissions or by trials." SPA 15. This Court should reverse the district court's order because it conflicts with well-established judicial practice and interferes with the executive power vested in the Commission, and this Court should direct the district court to enter the consent judgment as proposed.

For over a century, federal agencies have frequently entered into injunctive consent judgments with defendants who do not admit to or who outright deny the allegations against them in matters of public importance no less significant than "the transparency of financial markets." SPA 15. And for over a century, courts,

18

including the district court here, have approved these consent judgments as consistent with the public interest without any suggestion that the absence of "proven or acknowledged facts" precludes the invocation of the court's injunctive power. In rejecting the Citigroup consent judgment, the district court departed from this long-standing practice by requiring "facts, established either by admissions or by trials" as precondition to approval.

The district court's rule interferes with the Commission's exercise of its law enforcement powers. The district court did not defer to the Commission's decision to resolve the matter through a consent judgment, which the Commission reached after years of investigation and lengthy negotiations with Citigroup. This decision reflected the Commission's judgment that settlement best served the public interest given the balance of various factors, such as litigation risk, resource allocation, and the relief contained in the judgment, which represented a substantial portion of what the Commission could have obtained after a successful trial. If left standing, the rule established by the district court will make it more difficult for the Commission to enter into settlements, forcing the Commission, with its limited budget, to pursue fewer cases. Such a rule intrudes upon the Commission's authority to allocate its resources, and ultimately harms investors.

The district court also exceeded its discretion because the consent judgment was fair, reasonable, adequate, and in the public interest. The Commission obtained the prohibitory injunctive relief it requested in the complaint, more than 80% of the monetary relief it could have obtained at trial if successful, and a mandatory injunction ordering Citigroup to alter its business practices—all while mitigating litigation risk and minimizing consumption of the Commission's finite resources. While the district court criticized the size of the penalty, the absence of scienter-based charges, and the inability of investors to harness the consent judgment for collateral estoppel purposes in private litigation, these criticisms do not justify rejecting the proposed consent judgment.

The district court's order should be reversed on appeal, but if this Court finds that it does not have jurisdiction under Section 1292(a)(1), the Court should grant the Commission's petition for a writ of mandamus because the Commission will have no other adequate means to obtain the entry of the consent judgment. Given the importance of the district court's ruling for the Commission—and many other federal agencies—mandamus is appropriate, and the Commission has a clear and indisputable right to the writ because the district court abused its discretion by rejecting the consent judgment based on its improper bright-line rule.

20

**ARGUMENT**

I.    **The district court's ruling that a consent judgment imposing injunctive relief cannot be fair, reasonable, adequate, or in the public interest unless supported by admitted or judicially established facts is contrary to established law.**

The district court's ruling was broad and definitive.  It stated that a proposed consent judgment seeking injunctive relief must be supported by "proven or acknowledged facts"—"cold, hard, solid facts, established either by admissions or by trials"—or it cannot be approved as reasonable, fair, adequate, and in the public interest.  SPA 14–15.  By requiring "established" facts as a precondition to approval— and disallowing any other evidentiary showing, such as detailed factual allegations that the defendant cannot deny under the terms of the consent judgment—the court created a bright-line rule that this Court should reject as contrary to long-standing precedent.

A.    **Government agencies frequently resolve matters through consent judgments, which are judicially enforced settlements.**

Consent judgments, which are also referred to as consent decrees, trace their roots back nearly 800 years to English common law and appeared in the U.S. by the 19th century.  Judith Resnik, *Judging Consent*, 1987 U. CHI. LEGAL F. 43, 45, 50–53 (1987).  They are unique forms of settlement because they possess

21

"attributes both of contracts and of judicial decrees." *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236 n.10 (1975).

Consent judgments resemble contracts because they "are entered into by parties to a case after careful negotiation has produced agreement on their precise terms." *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). A consent judgment "embodies a compromise" that reflects, among other things, litigation risk and the costs of trial. *Id.* As with any settlement, a consent judgment reflects a "balance of advantages and disadvantages" for a federal agency like the Commission: although the Commission does not obtain "findings of fact and court opinions clearly setting forth the reasons for the result," it is "able to conserve its own and judicial resources" while obtaining relief that benefits investors. *SEC v. Clifton*, 700 F.2d 744, 748 (D.C. Cir. 1983) (per curiam).

Consent judgments also have attributes of judicial decrees because, unlike voluntary settlements, they always result in a judgment entered by a court. Historically, courts played a limited role when reviewing proposed consent judgments: they did not "make any determination of the merits" and they made no "inquiry into, or preliminary adjudication of, the facts or the law applicable thereto.'" *Resnick*, 1987 U. CHI. LEGAL F. at 53–54, quoting 3 A.C. Freeman, A TREATISE ON THE LAW OF JUDGMENTS § 1350, at 2773 (5th ed. 1925). The scope

22

of this review has remained narrow over time: as this Court noted, "[u]nless a consent decree is unfair, inadequate, or unreasonable, it ought to be approved." *Wang*, 944 F.2d at 85.

Federal government agencies utilize consent judgments extensively. The Commission commenced 154 civil actions in the district courts of the Second Circuit between 2005 and 2007. In 134 of those cases (87%), the Commission entered into—and a court approved—a consent judgment with one or more defendants. *Clifton*, 700 F.2d at 748 ("over 90% of the SEC's cases are resolved by [consent] decree"). In recent years, the EEOC resolved 80% of its cases and the FTC resolved 80% of its antitrust actions by consent judgment. U.S. EEOC, *Office of the General Counsel FY 2009 Annual Report*, at 62 (2009); U.S. FTC, *The FTC in 2010*, at 2 (2010). The "vast majority" of civil antitrust cases brought by the Department of Justice are resolved in this fashion. Acting Principal Deputy Assistant Attorney General John M. Nannes, *Termination, Modification, and Enforcement of Antitrust Consent Decrees*, 15 ANTITRUST 55, 55 (2000). Civil environmental enforcement actions follow a similar pattern. Kristi Smith, *Who's Suing Whom: A Comparison of Government and Citizen Suit Environmental Actions Brought Under EPA-Administered Statutes, 1995-2000*, 29 COLUM J. ENVTL. L. 359, 387 (2004) (asserting, based on a sample limited by year and

23

statute, that 70% of enforcement actions are resolved by consent decree); Robert V.

Percival, *The Bounds of Consent: Consent Decrees, Settlements and Federal*

*Environmental Policy Making*, 1987 U. CHI. LEGAL F. 327, 330 ("The vast

majority of environmental enforcement actions [are] resolved by negotiated

settlement.").

Consent judgments are crucial for agencies and courts. As this Court

recognized at a time when the Commission's caseload was smaller, the

Commission "can bring the large number of enforcement actions it does *only*

because in all but a few cases consent decrees are entered." *SEC v. Everest Mgmt.*

*Corp.*, 475 F.2d 1236, 1240 (2d Cir. 1972) (emphasis added). Courts also benefit

because consent judgments conserve judicial resources, which is the primary

reason for the "strong federal policy favoring the approval and enforcement of

consent decrees." *Wang*, 944 F.2d at 85; *Anita Foundations, Inc. v. ILGWU Nat'l*

*Retirement Fund*, 902 F.2d 185, 190 (2d Cir. 1990) (settlements "represent

compromise and conservation of judicial resources, two concepts highly regarded

in American jurisprudence"). By "lessening docket congestion," consent

judgments "make[] it possible for the judicial system to operate more efficiently

and more fairly while affording plaintiffs an opportunity to obtain relief at an

earlier time." *Evans v. Jeff D.*, 475 U.S. 717, 760 n.15 (1986).

24

**B.** **For over a century, courts have approved consent judgments that concern matters of extraordinary importance, that order wide-ranging injunctive relief, and that contain provisions in which defendants do not admit, or outright deny, the allegations in the complaint and liability for violations of the law**.

*1. Consent judgments without admissions are commonplace.*

The district court criticized the "SEC's long-standing policy" of permitting "defendants to enter into consent judgments" without requiring them to admit liability or the underlying allegations. SPA 9. But that "policy" is not unique to the Commission; "[i]t is commonplace for settlements to include no binding admission of liability." *Citigroup Stay Order*, 673 F.3d at 166. As the Supreme Court has recognized, without any hint of condemnation, defendants entering into injunctive consent judgments "often admit no violation of the law." *ITT Continental Baking*, 420 U.S. at 236 n.10. In describing one such consent decree, which stated that nothing in the consent was "intended to constitute an admission of fault," the Supreme Court stated that it was "customary" that "the consent decree did not purport to adjudicate" the plaintiff's claims. *Maher v. Gagne*, 448 U.S. 122, 126 n.8 (1980). Contrary to the district court's ruling that this practice is never permissible, the Supreme Court has discussed consent judgments containing similar provisions without any suggestion that they are unfair, unreasonable, inadequate, or not in the public interest. *E.g., Swift & Co. v. United States*, 276

25

U.S. 311 (1928) (refusing to vacate consent judgment in which defendant denied

allegations of complaint); *United States v. Armour & Co.*, 402 U.S. 673 (1971)

(addressing same consent judgment).[4]

The district judge's criticism of the Citigroup consent judgment runs

contrary not only to Supreme Court precedent, but also to the judge's previous

rulings. Before this case, the judge approved numerous Commission consent

judgments even though they contained "no admit/no deny" provisions that were

functionally identical to those included in this consent judgment.[5] The judge also

---

[4] *Accord Arizona v. California*, 530 U.S. 392, 414 (2000); *Suter v. Artist M.*, 503 U.S. 347, 354 n.6 (1992); *Firefighters Local No. 1784 v. Stotts*, 467 U.S. 561, 565, 577 (1984); *United States v. Atlantic Refining Co.*, 360 U.S. 19, 23 & n.3 (1959); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 141 n.3 (1948).

[5] *See SEC v. Collins*, No. 07-11343 (JSR) (S.D.N.Y. Jun. 10, 2010); *SEC v. Forest Resources Mgmt. Corp.*, No. 09-903 (JSR) (S.D.N.Y. Mar. 30, Apr. 29, Oct. 15, 2009); *SEC v. Ebbers*, No. 05-6378 (JSR) (S.D.N.Y. Jul. 22, 2005); *SEC v. Saad*, No. 05-3308 (JSR) (S.D.N.Y. May 18, 2005 & Jul. 31, 2006); *SEC v. Gulkin*, No. 03-9813 (JSR) (S.D.N.Y. Dec. 12, 2003); *SEC v. Worldcom*, No. 02-4963 (JSR) (S.D.N.Y. Nov. 26, 2002 & Jul. 7, 2003); *SEC v. Vinson*, No. 02-8083 (JSR) (S.D.N.Y. Nov. 26, 2002); *SEC v. Myers*, No. 02-7749 (JSR) (S.D.N.Y. Nov. 15, 2002); *SEC v. Yates*, No. 02-7958 (JSR) (S.D.N.Y. Nov 15, 2002); *SEC v. Platinum Investment Corp.*, No. 02-6093 (JSR) (S.D.N.Y. Aug. 12 & Oct. 15, 2002); *SEC v. Accornero*, No. 01-6452 (JSR) (S.D.N.Y. Jul. 20, 2001).

approved consent judgments negotiated by other agencies in which defendants did not admit, or even denied, the allegations against them and disclaimed liability.[6]

As these cases suggest, consent judgments in which "none of the issues are actually litigated"—because the defendants do not admit, or outright deny, the factual allegations or liability—are the norm. RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982). Almost a century ago, it was recognized that "[n]o hearing or trial" needed to be conducted and "no findings" needed to be made before a court entered a consent judgment imposing injunctive relief. 3 Freeman § 1349, at 2772. Consent judgments without admissions have been common enough that Black's Law Dictionary defined a "consent decree" as a judgment "whereby the defendant agrees to stop alleged illegal activity without admitting guilt or wrongdoing." BLACK'S LAW DICTIONARY 410 (6th ed. 1990). Similarly, a leading civil procedure treatise states that the "central characteristic of a consent judgment is that the court has not actually resolved the substance of the issues presented." 18A Charles A. Wright and Arthur R. Miller, FEDERAL PRACTICE AND

---

[6] *FTC v. Diet Coffee, Inc.*, No. 08-0094 (JSR) (S.D.N.Y. Jan. 10, 2008) (consent decree in false advertising suit; defendant agrees to judgment "without admitting" allegations); *United States v. New Puck, LP*, No. 04-5449 (JSR) (S.D.N.Y. Jul. 14, 2004) (consent decree in ADA suit stating that "the defendant denies liability"); *CFTC v. Kelly*, No. 98-5270 (JSR) (S.D.N.Y. Nov. 5, 1998) (consent order in commodities fraud suit in which defendant "neither admit[s] nor den[ies]" allegations).

PROCEDURE § 4443, at 256–57 (2d ed. 2002); *see also* 1 Talbot S. Lindstrom &

Kevin P. Tighe ANTITRUST CONSENT DECREES ix (1974) (the antitrust consent

decree's "principal characteristic is the provision that the consent implies no

admission or determination that there has been a violation of the antitrust laws").

> 2.    *Courts have routinely and consistently approved consent*
> *judgments ordering injunctive relief and concerning matters of*
> *public importance despite the inclusion of provisions in which*
> *defendants do not admit, or deny, allegations and liability.*

The district court ruled that any consent judgment that is premised on "mere

allegations," SPA 14, or that does not advance the "truth"—by "cold, hard, solid

facts, established either by admissions or by trials," SPA 14–15—must be rejected.

The court emphasized that a consent judgment imposing injunctive remedies,

"enforced by the formidable judicial power of contempt," SPA 8, must be

supported by "proven or acknowledged facts," SPA 14, particularly when it

touches "on the transparency of financial markets whose gyrations have so

depressed our economy and debilitated our lives," giving rise "to an overriding

public interest in knowing the truth," SPA 15.  Yet matters of exceptional public

importance, including lawsuits alleging violations of the securities, antitrust,

consumer protection, environmental, public health, and civil rights laws have been

routinely resolved, with judicial approval, through consent judgments that order

28

significant injunctive relief even though they are premised on "mere allegations," SPA 14.

There are thousands of such consent judgments, a few of which are described below.  In some consent judgments, a defendant does not admit or denies liability.  In others, a defendant does not admit or denies the factual allegations in the complaint.  In many, a defendant does both.  The common thread linking them all is judicial approval without the fact-finding that this district court held is always required.

*Securities*—Courts have regularly approved injunctive consent judgments proposed by the Commission that are not based on "proven or acknowledged facts."  SPA 14.  In this circuit, every single consent judgment presented by the Commission between 2005 and 2007 contained language that was functionally identical to the language in the Citigroup consent judgment.  All were approved.

The importance of the case has not precluded approval in the absence of admissions.  As one example, the same district judge who rejected the consent judgment here approved a consent judgment in which Worldcom agreed to injunctive relief—and later, a $750 million penalty, one of the largest ever obtained by the Commission—without admitting or denying the fraud allegations in the complaint.  *SEC v. WorldCom*, No. 02-CV-4963 (JSR) (S.D.N.Y. Nov. 26, 2002 &

Jul. 7, 2003).  The injunctive relief ordered by the court was "substantial," SPA 14:

it included a "complete overhaul of the company's corporate governance" and the

hiring of "independent consultants" to monitor these changes.  *SEC v. WorldCom,*

*Inc.*, 273 F. Supp. 2d 431, 432–33 (S.D.N.Y. 2003).  Yet the district court judge

did not withhold his approval for lack of "facts, established either by admissions or

by trials."  SPA 15.  Rather, he hailed the consent judgment as "not only fair and

reasonable but as good an outcome as anyone could reasonably expect,"

*WorldCom*, 273 F. Supp. 2d at 436.  He deemed it "a model of what should be

attempted in a case of this sort."  Seth Schiesel & Simon Romero, *WorldCom*

*strikes a deal with the SEC*, N.Y. TIMES, Nov. 27, 2002, at C5.

Other district courts, including those in this circuit, have also approved

Commission consent judgments containing "no admit/no deny" provisions.  Some

of the most substantial injunctive consent judgments proposed by the Commission

in the past decade (as measured by monetary relief obtained) included language

that is functionally identical to what appears in the Citigroup consent judgment.[7]

Moreover, nearly all of the largest injunctive consent judgments proposed by the

Commission in federal court in 2010 and 2011 contain "no admit/no deny"

---

[7] *E.g., SEC v. AIG*, No. 06-1000 (S.D.N.Y. Feb. 17, 2006) ($800 million); *SEC v. FNMA*, No. 06-959 (D.D.C. Aug. 9, 2006) ($350 million).

30

clauses.[8] District judges approved them without any suggestion that the absence of "proven or acknowledged facts" precluded their entry. SPA 14.

*Antitrust*—Antitrust consent decrees in which a defendant does not admit facts or liability have restructured entire industries, significantly affecting the economy. Richard A. Epstein, ANTITRUST CONSENT DECREES IN THEORY AND PRACTICE 1 (2007). In *United States v. Microsoft Corp.*, the Department of Justice used the "not uncommon technique" of entering into a consent decree to resolve allegations that Microsoft unlawfully monopolized the market for operating systems used by IBM-compatible PCs. 56 F.3d 1448, 1451–52 (D.C. Cir. 1995). The district court rejected the decree, which prohibited Microsoft from engaging in conduct that would deter the use of competing operating systems, in part because

---

[8] *SEC v. Alexander*, No. 06-3844 (E.D.N.Y. Nov. 30, 2011) ($54 million); *SEC v. JP Morgan Secs. LLC*, No. 11-3877 (D.N.J. Jul. 7, 2011) ($51 million); *SEC v. Johnson & Johnson*, No. 11-686 (D.D.C. Apr. 13, 2011) ($49 million); *SEC v. UBS Fin. Servs.*, No. 11-2539 (D.N.J. May 6, 2011) ($47 million); *SEC v. Alcatel-Lucent, SA*, No. 10-24620 (S.D. Fla. Dec. 30, 2010) ($45 million); *SEC v. Goldman, Sachs & Co.*, No. 10-3229 (BSJ) (S.D.N.Y. Jul. 20, 2010) ($550 million); *SEC v. ENI, S.p.A*, No. 10-2414 (S.D. Tex. Jul. 20, 2010) ($125 million); *SEC v. Technip*, No. 10-2289 (S.D. Tex. Jul. 9, 2010) ($98 million); *SEC v. Citigroup Inc.*, No. 10-1277 (D.D.C. Oct. 8, 2010) ($75 million); *SEC v. ABB Ltd.*, No. 10-1648 (D.D.C. Oct. 12, 2010) ($39 million); *SEC v. Diebold, Inc.*, No. 10-908 (D.D.C. Jun. 14, 2010) ($25 million); *SEC v. General Elec. Co.*, No. 10-1258 (D.D.C. Jul. 30, 2010) ($23 million); *SEC v. Pequot Capital Mgmt.*, No. 10-831 (D. Conn. Jun. 2, 2010 ($23 million).

31

Microsoft did not admit the allegations in the complaint. *Id*. at 1461.[9] The D.C. Circuit reversed, holding that the judge's "criticism of Microsoft for declining to admit that the practices charged in the complaint actually violated the antitrust laws" was "unjustified." *Id*.

Courts have long approved antitrust consent decrees that order substantial injunctive relief and contain similar provisions. The very first antitrust consent decrees, which date back to 1906 and which enjoined an array of anticompetitive conduct, featured disclaimers of admissions and liability. *United States v. Otis Elevator Co.*, No. 13884 (N.D. Cal. Jun. 1, 1906); *United States v. American Coal Prods. Co.*, No. E 10-124 (S.D.N.Y. Mar. 4, 1913); *United States v. The New Departure Mfg. Co.*, No. 48-A (W.D.N.Y. May 27, 1913), cited in 1 Lindstrom & Tighe, at 1, 16–19. "No admit" clauses were central to consent decrees that fundamentally altered the meatpacking industry, *Swift*, 276 U.S. at 320; that dismantled AT&T, one of the world's largest corporations at the time, *United States v. AT&T*, 552 F. Supp. 131, 143 (D.D.C. 1982) (decree "would not constitute any evidence against, an admission by, or an estoppel against AT&T"),

---

[9] The consent judgment stated that it did not constitute "any evidence or admission by any party with respect to any issue of fact or law." *United States v. Microsoft Corp.*, No. 94-1564 (D.D.C. Jul. 15, 1994), *available at* http://www.justice.gov/atr/cases/f0000/0047.htm.

*aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); that restricted CBS (and the other two major television networks, ABC and NBC) from acquiring financial interests and syndication rights in programs obtained from independent producers, *e.g., United States v. CBS*, 1980 U.S. Dist. Lexis 14679 (C.D. Cal. Jul. 3, 1980) (consenting to judgment "without trial or adjudication of any issue of fact or law"); and that resolved charges of price fixing asserted against six airlines, *United States v. Airline Tariff Publ'g Co.*, 1994 U.S. Dist. Lexis 11904 (D.D.C. Aug. 10, 1994) (consent judgment would "not be evidence against or an admission by any party with respect to any issue of fact or law").

Courts have approved antitrust consent judgments without admissions even after reviewing them under the Tunney Act, which requires courts to consider, among other things, "the public benefit, if any, to be derived from a determination of the issues at trial." 15 U.S.C. 16(e).[10] The Commission is not aware of any decision since Congress enacted the Tunney Act where a court rejected a consent judgment containing a no-admit provision because the public would not have the benefit of adjudicated facts. Thus, even where courts are statutorily required to

---

[10] Congress recognized that "[o]rdinarily, defendants do not admit to having violated the antitrust or other laws," but it made no attempt to prohibit this practice. H.R. REP. NO. 93-1463, at 6 (1974); *see also* S. REP. NO. 93-298, at 5 (1973) (stating that a defendant agreeing to a consent decree "does not admit to having violated the law as alleged in the complaint").

33

consider the benefits of trial, no court has ruled that the absence of "facts, established by admissions or by trials," justifies the rejection of a consent judgment. SPA 14.

*Consumer protection*—The FTC frequently utilizes consent decrees in which a defendant makes no factual or legal admissions. Countrywide Home Loans, without "admitt[ing] any of the allegations" that it overcharged 500,000 borrowers, entered into a consent judgment in which it agreed to be enjoined from engaging in certain conduct, to change its lending practices, and to pay $108 million. *FTC v. Countrywide Home Loans*, No. 10-4193 (C.D. Cal. Jun. 15, 2010). And ChoicePoint, a data broker accused of unlawfully disclosing the records of nearly 200,000 consumers, agreed to injunctive relief and payment of the largest-ever civil penalty imposed by the FTC as part of a consent judgment that stated, "Defendant makes no admissions to, and denies, the allegations in the complaint." *United States v. Choicepoint, Inc.*, No. 06-0198 (N.D. Ga. Feb. 15, 2006).[11]

*Environmental law*—Courts have approved hundreds of consent judgments resolving environmental law enforcement actions in which there are no "proven or acknowledged" facts. SPA 14. In one of the largest consent judgments (as measured by the cost of the injunctive relief), the defendant, which denied that it

---

[11] Available at http://www.ftc.gov/os/caselist/indexc.shtm.

violated the Clean Air Act or was liable "for civil penalties or injunctive relief,"

agreed to spend approximately $4.6 billion to cut emissions and to pay a $15

million penalty. *United States v. American Electric Power Serv. Corp.*, No. 99-

1250 (S.D. Ohio Dec. 10, 2007). In another instance, BP resolved charges that it

violated the Clean Air Act in connection with the Texas City refinery explosion,

which killed 15 people and injured 170, by entering into a consent judgment that

ordered it to undertake an array of remedial measures and pay one of the largest

civil penalties ever assessed for Clean Air Act violations at an individual facility.

BP consented "without the adjudication or admission of any issue of fact or law"

and did "not admit any liability to the United States arising out of the transactions

or occurrences alleged in the complaint." *United States v. BP Prods. North*

*America Inc.*, No. 10-3569 (S.D. Tex. Dec. 30, 2010).

Other consent judgments that ordered substantial injunctive relief along with

large penalties contained similar provisions and were approved. *United States v.*

*Massey Energy Co.*, No. 07-299 (S.D. W.Va. Apr. 9, 2008) (defendants, who did

"not admit any liability," agreed to undertake various remedial measures and pay a

$20 million penalty, one of the largest ever penalties for wastewater discharge

violations); *United States v. Caterpillar, Inc.*, No. 98-02544 (D.D.C. Jul. 1, 1999),

cited by *United States v. Caterpillar, Inc.*, 2002 U.S. Dist. Lexis 468, at *7 (D.D.C.

35

Jan. 17, 2002) (a group of defendants, which denied violating the Clean Air Act, agreed to spend nearly $1 billion dollars in remediation and pay a $83.4 million penalty, one of the largest civil penalties ever imposed); *United States v. Koch Indus.*, No. 95-1118 (S.D. Tex. Mar. 7, 2000) (defendant, which did "not admit any liability," resolved claims related to over 300 oil spills by agreeing to clean up the spills and pay a $30 million penalty, one of the largest penalties ever imposed upon a single company).[12]

*Public Health*—Consent decrees between the FDA and biomedical firms accused of violating the Food, Drug, and Cosmetic Act contain similar disclaimers of admissions and liability. In one consent judgment, Abbott Laboratories agreed to pay a $100 million fine and to cease manufacturing over 50 diagnostic products "without admitting the allegations of the Complaint." *United States v. Abbott*

---

[12] Courts have also approved numerous consent judgments in which municipal governments denied violating the Clean Water Act in connection with sewage overflows that contaminated public water supplies, but agreed to spend billions of dollars to prevent future violations. *E.g., United States v. Metro. St. Louis Sewer Dist.*, No. 07-1120 (E.D. Mo. Apr. 27, 2012) (defendant "does not admit any liability" in consent decree imposing $4.7 billion in injunctive relief and $1.2 million penalty); *United States v. Northeast Ohio Regional Sewer Dist.*, No. 10-02895 (N.D. Ohio Jul. 7, 2011) (defendant "denies any liability"); *United States v. Kansas City*, No. 10-0497 (W.D. Mo. Jul. 27, 2010) ("without admission by the City of any of the non-jurisdictional allegations in the Complaint"). All of the EPA's consent decrees cited are available at http://www.epa.gov/compliance/resources/cases/index.html.

*Laboratories*, No. 99-7135 (N.D. Ill. Nov. 2, 1999). Schering-Plough paid a $500 million fine—the largest at the time—and halted production of nearly 75 drugs "without admitting or denying the allegations of the Complaint and disclaiming any liability in connection herewith." *United States v. Schering-Plough Corp.*, No. 02-2397 (D.N.J. May 20, 2002).[13]

*Civil rights*—The approval of consent judgments that order significant injunctive relief without admissions by defendants—or with outright denials—also occurs with great frequency in the civil rights context:

• State and municipal law enforcement agencies have altered their policing practices pursuant to approved consent judgments resolving allegations of unconstitutional conduct by police officers. *E.g., United States v. City of Los Angeles*, No. 00-11769 (C.D. Cal. Jun. 15, 2001) ("defendants deny the allegations in the Complaint"); *United States v. New Jersey*, No. 99-5970 (D.N.J. Dec. 30, 1999) (the State "denies" the allegations).[14]

---

[13] Available at http://www.fda.gov/downloads/MedicalDevices/ResourcesforYou/Industry/ucm111119.pdf (Abbott); http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm095873.htm (Schering-Plough).

[14] Available at http://www.lapdonline.org/assets/pdf/final_consent_decree.pdf; http://www.justice.gov/crt/about/spl/split_archive_findsettle_ 2004.php.

- Schools have desegregated and agreed to undertake other remedial steps to resolve charges of racial, gender, and ethnic discrimination.  *E.g.*, *A.B. v. Rhinebeck Central Sch. Dist.*, No. 03-3241 (S.D.N.Y. Mar. 24, 2006) (defendant "denies each and every" allegation of the complaint); *United States v. City of New York*, No. 04-2248 (E.D.N.Y. Jun. 1, 2004); *United States v. Board of Educ. of Chicago*, 88 F.R.D. 679, 681 n.2 (N.D. Ill. 1981) ("[T]he Board neither admits nor denies the allegations of the Complaint.").[15]

- Municipalities have changed their election procedures to remedy election law violations.  *E.g., United States v. Salem County*, No. 08-03276 (D.N.J. Jul. 28, 2008) ("Defendants do not admit the allegations of the Complaint."); *United States v. Osceola County*, No. 02-738 (M.D. Fla. Jul. 22, 2002) ("Defendants deny any violation of the Voting Rights Act").[16]

- Defendants have modified their facilities and altered practices to comply with the Americans with Disabilities Act.  *E.g., United States v. Inova Health Sys.*, No. 10-714 (E.D. Va. Mar. 30, 2011) (defendant "denies the allegation" that it violated the ADA); *United States v. NCAA*, No. 98-1290

---

[15] Available at http://www.justice.gov/crt/about/edu/.

[16] Available at http://www.justice.gov/crt/about/vot/litigation/caselist.php.

38

(D.D.C. May 27, 1998) (defendant "disputes the allegations" in the complaint).[17]

• Banks and housing companies have resolved claims of unlawful discrimination in lending and leasing by agreeing to injunctive relief and penalties. *United States v. Albank FSB*, No. 97-1206 (W.D.N.Y. Aug. 13, 1997) (consent judgment "is not and is not to be considered an admission or finding of any violation of law"); *United States v. Hillman Housing Corp.*, No. 02-0626 (S.D.N.Y. Oct. 27, 2004) (defendants "do not admit any liability").[18]

• Large companies have altered their employment practices and paid fines to resolve charges of employment discrimination. *EEOC v. Eastman Kodak Co.,* 2006 U.S. Dist. Lexis 96433, at *3 (W.D.N.Y. Oct. 6, 2006) (defendant "expressly denies any and all liability or wrongdoing"); *EEOC v. Morgan Stanley & Co.*, 256 F.R.D. 124, 124 (S.D.N.Y. 2004) (defendant "denies any wrongdoing or liability").

These are just a few examples of the thousands of consent judgments approved by courts that order significant injunctive relief and impose considerable

---

[17] Available at http://www.ada.gov/settlemt.htm.

[18] Available at http://www.justice.gov/crt/about/hce/caselist.php#pa.

monetary relief based only on a complaint's allegations. The district court asked rhetorically how it can "ever be reasonable to impose substantial relief on the basis of mere allegations," SPA 14, but this judicial practice shows that courts have repeatedly found it reasonable in a multitude of contexts.

### C. Set against this judicial practice, the district court's rule has no support in the law and should be reversed.

As demonstrated above, courts have routinely approved consent judgments that contain provisions in which defendants either do not admit facts or liability—or outright deny facts and liability. These consent judgments have imposed substantial injunctive (and monetary) relief. They have affected the lives of millions of U.S. residents in matters of no less importance than the "transparency of financial markets," SPA 15, such as: the desegregation of our schools, the competitiveness of our industries, the civil rights of our citizens, the protection of our natural resources, and the safety of our pharmaceuticals and medical devices.

Despite this judicial history, the district court here rejected the proposed consent judgment because of the absence of "any proven or acknowledged facts." SPA 14. But the notion that a district court cannot "deplo[y]" its injunctive power without "facts, established either by admissions or by trials" has no foundation in

40

the law, and the inclusion of the injunctive relief or the presence of important issues does not justify the district court's novel rule.  SPA 15.

## II. The district court did not give proper deference to the Commission's reasonable assessment that the consent judgment sufficiently satisfied its enforcement objectives, and the court thereby intruded upon the powers constitutionally entrusted to executive officials.

The district court's bright-line rule, in addition to disregarding long-standing judicial practice, interferes with the ability of agencies like the Commission to "'take Care that the Laws be faithfully executed.'"  *Board of Trade v. SEC*, 883 F.2d 525, 531 (7th Cir. 1989), quoting U.S. CONST., ART. II, § 3.  The district court did not properly defer to the Commission's decision to enter into a consent judgment after weighing its advantages and disadvantages.  If left standing, the district court's rule will make it more difficult for the Commission and other agencies to enter into settlements, interfering with the Commission's ability to manage its enforcement program and allocate its resources.  Such a rule would, in the Commission's view, ultimately harm investors.

### A. The district court did not defer to the Commission's decision to enter into the consent judgment.

The district court did not afford the Commission the deference owed to "the judgment of the government agency which has negotiated and submitted the proposed judgment."  *SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984).

41

Where, as here, "a government actor committed to the protection of the public interest," and a defendant, itself "knowledgeable and represented by experienced lawyers," have together "hammered out an agreement at arm's length and advocate[d] its embodiment in a judicial decree," the "[r]espect for the agency's role" is at its apex. *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). The Supreme Court, applying this deference, has declined "to assess the wisdom of the Government's judgment in negotiating and accepting" consent decrees, "at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting." *Sam Fox Publ'g Co. v. United States*, 366 U.S. 683, 689 (1961).

In light of the deference afforded to government agencies negotiating consent judgments, judicial review is limited. As this Court has explained, "[u]nless a consent decree is unfair, inadequate, or unreasonable, it ought to be approved." *Wang*, 944 F.2d at 85 (internal quotation marks omitted). The court's role is not to decide "whether the settlement is one which the court itself might have fashioned, or considers as ideal," *Cannons Eng'g Corp.*, 899 F.2d at 84, to withhold approval unless the court determines that the proposed judgment "is the best possible settlement that could have been obtained," *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991), or to "engage in an

42

unrestricted evaluation of what relief would best serve the public," *United States v.*

*BNS Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (internal quotation marks omitted).

Rather, courts must defer to agencies in keeping with the constitutionally

mandated separation of powers that assigns to the Commission the responsibility to

execute the securities laws.[19]  The decision to investigate, to prosecute, and to settle

is solely an executive function.  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)

(decision to investigate or prosecute); *New York State Law Dep't v. FCC*, 984 F.2d

1209, 1213–15 (D.C. Cir. 1993) (applying *Heckler* to decision to settle).  In

deciding whether to settle, agencies such as the Commission must assess "whether

agency resources are best spent on this violation or another, whether the agency is

likely to succeed if its acts," *Heckler*, 460 U.S. at 831–32, and whether "the

benefits of pursuing an adjudication" outweigh "the costs to the agency (including

financial and opportunity costs)," *New York State*, 984 F.2d at 1213.

These decisions are entrusted to agencies, not courts, because an agency is

"far better equipped than the courts to deal with the many variables involved in the

proper ordering of its priorities."  *Heckler*, 460 U.S. at 831–32.  "[C]ase-versus-

_____

[19] This deference also reflects "the federal policy encouraging settlement." *United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011); *see also In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 118 (2d Cir. 1992); *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 1993).

43

case is the daily tradeoff" that the agencies like the Commission must face, and the Commission's considerable experience overseeing its enforcement program puts the Commission in the best position to "compare the value of pursuing one case against the value of pursuing another." *Board of Trade*, 883 F.2d at 531. This experience, which the Commission has applied for decades when negotiating consent judgments that ultimately benefit investors, is deserving of deference.

Such deference is compatible with judicial review of consent judgments. A court may conclude that a proposed injunctive consent judgment is not fair, reasonable, adequate, or in the public interest because it proposes relief that disregards applicable law or adversely affects the rights of those who did not consent. *E.g.*, *St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264, 268 (8th Cir. 2011) (rejecting a proposed consent judgment because the parties agreed to violate local zoning laws); *City of Hialeah*, 140 F.3d at 975. A court may reject a proposed consent judgment because implementing the injunctive relief would commit an inappropriate level of judicial resources. *E.g., In re United States,* 503 F.3d 638, 641 (7th Cir. 2007) (a judge may reject a consent decree if its implementation "would create a drain on judicial resources"). And a court, paying "special attention to the decree's clarity," may seek to resolve any ambiguity in a consent

44

decree prior to approval since the court "must preside over [its] implementation."

*Microsoft*, 56 F.3d at 1461–62.

But rejecting a consent judgment because the proposed injunctive relief is "unsupported by any proven or acknowledged facts" goes too far. SPA 14. "There is no indication in the record that the court in fact gave deference" to the Commission's decision—reached after years of investigation and lengthy negotiations with Citigroup—to settle the matter as opposed to proceeding to trial. *Citigroup Stay Order*, 673 F.3d at 164. The court disregarded the Commission's balancing of numerous factors, including "the value of the particular proposed compromise, the perceived likelihood of obtaining a still better settlement, [and] the prospects of coming out better, or worse, after a full trial." *Id.* Nor did the court acknowledge the Commission's determination that forgoing a formal adjudication in order to obtain guaranteed and immediate relief—which permits the Commission to pursue other investigations and enforcement actions while still aiding investors—constituted "the optimal allocation of its limited resources." *Id.* at 165. By not deferring to the Commission's judgment on these issues, the district court simply "imposed what it considered to be the best policy to enforce the securities laws," *id.* at 165, and "impermissibly arrogated to [itself] the President's

45

role 'to take care that the laws be faithfully executed.'" *Microsoft*, 56 F.3d at

1457.[20]

### B. The district court's rule interferes with the Commission's allocation of resources by restricting its ability to resolve matters by consent judgment and mitigate the risk of trial.

The power to allocate resources across an entire enforcement program rests

with the Commission. The rule created by the district court, if left standing and

adopted by other courts, would usurp that power by limiting the Commission's

ability to enter into consent judgments, which would have significant implications

for the Commission's enforcement program.

A court's refusal to accept a proposed consent judgment has "enormous

practical consequences for the government's ability to negotiate future

settlements." *Microsoft*, 56 F.3d at 1456 (reversing the rejection of the Microsoft

antitrust consent decree). Here, the main consequence is a severe limitation on the

Commission's ability to enter into consent judgments at all. The Commission's

policy of allowing defendants to enter into consent judgments without admitting

the underlying allegations is "hallowed" by reason as much as it is "by history."

---

[20] *See SEC v. Blinder, Robinson & Co.*, 855 F.2d 677 (10th Cir. 1988) (holding that the Commission's exercise of its law enforcement authority is constitutionally valid and consistent with Article II); *FTC v. American Nat'l Cellular*, 810 F.2d 1511, 1514 (9th Cir. 1987) (reaching same conclusion with regard to FTC).

SPA 9.  The reason is that many, and perhaps most, defendants will not admit to factual allegations because they are concerned about, among other things, the collateral estoppel effect of admissions on parallel private actions.  *Citigroup Stay Order*, 673 F.3d at 161; Business Roundtable Br. 5 (Dkt. No. 82); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331–32 (1979).  As a result, successful negotiation of consent judgments, in the Commission's experience, often hinges upon the inclusion of provisions where a defendant expressly does not admit the allegations in the complaint.  The prevalence of similar provisions in settlements negotiated by other federal government agencies likely reflects the same dynamic.

Notably, the Commission has adopted a more stringent policy than many other agencies; it does not permit defendants *to deny* the allegations in the complaint.  17 C.F.R. § 202.5(e).  Because "it is important to avoid creating, or permitting to be created, an impression that a decree is being entered or a sanction imposed, when the conduct alleged did not, in fact, occur," the Commission does not allow a defendant "to consent to a judgment" that "imposes a sanction while denying the allegations in the complaint."  *Id*.  The no admit/no deny language that stems from this policy and that appears in many Commission consent judgments factors into the "balance of advantages and disadvantages" that the Commission

47

considers in each case and that courts have been reluctant to disrupt. *Clifton*, 700 F.2d at 748; *Randolph*, 736 F.2d at 530.[21]

The district court's order upsets this balance. "A settlement is by definition a compromise." *Citigroup Stay Order*, 673 F.3d at 166; *Armour*, 402 U.S. at 681 (a consent judgment "embodies a compromise"). But, if left standing and adopted by other judges (particularly those in financial centers like New York), the district court's rule would curtail the Commission's ability to reach such compromises. A rule requiring the rejection of a consent judgment unless liability "had been either proved or disproved at trial or one side or the other had conceded the issue" is "tantamount to ruling that in such circumstances, a court will not approve a settlement that represents a compromise." *Citigroup Stay Order*, 673 F.3d at 166.

Without the ability to compromise, the Commission would face a difficult dilemma. "Congress gives the [Commission] a budget, setting a cap on its personnel," and consequently time spent on one case "means less time for something else" because trials consume significant resources. *Board of Trade,* 883

---

[21] In a policy change unrelated to this case, the Commission announced in early 2012 that it would no longer allow the inclusion of "no admit/no deny" clauses in consent judgments reached with defendants who have admitted to or have been convicted of criminal violations in parallel criminal proceedings involving factual or legal claims that overlap with those asserted in the Commission's civil complaint. *See* Statement of Robert Khuzami (Jan. 7, 2012), *available at* http://www.sec.gov/news/speech/2012/spch010712rsk.htm.

48

F.2d at 531. The Commission could not try the substantial percentage of district court cases currently resolved by consent judgments each year—roughly 90%, *see supra* p. 23—given the agency's limited budget and its manifold statutory obligations to regulate the securities markets for the protection of investors. The Commission would then be unable to pursue some district court enforcement actions that would benefit investors if they were resolved by consent judgment. Or it would find it necessary to bring more administrative proceedings, losing the benefits of litigating in district court and frustrating Congress's objective in opening the federal courts to Commission enforcement actions.

The Commission should not have to face this quandary, and the district court's rule impermissibly intrudes upon the Commission's power to allocate its finite resources in a manner that it believes will best benefit the public. The Seventh Circuit has explained why the judiciary "cannot intelligently supervise the Commission's allocation of its staff's time." *Board of Trade*, 883 F.2d at 531. While judges "compare the case at hand against a rule of law," they "do not see the opportunity costs of reallocations within the agency," which are "governed by budgets and opportunities." *Id.* Judges "could make allocative decisions only by taking over the job of planning the agency's entire agenda, something neither authorized by statute nor part of their constitutional role." *Id.*

49

The district court's order crosses the threshold into making allocative decisions for the Commission. The end result would be an enforcement program driven not by the Commission's ability to obtain the best outcome for investors in the greatest number of cases given the resources that Congress provides, but rather by a judicial imperative requiring a factual adjudication in every instance.

**III.    The district court abused its discretion in rejecting the consent judgment proposed here, which is fair, reasonable, adequate, and in the public interest because the Commission obtained the injunctive relief it sought in the complaint and monetary relief totaling $285 million, which is more than 80% of what it could have reasonably expected to obtain if it prevailed at trial.**

The district court should have approved the consent judgment, which ordered most of the monetary relief and all the injunctive relief that the Commission requested in its complaint, while completely eliminating the Commission's exposure to litigation risk. In its complaint, the Commission sought a permanent injunction against further violations of Sections 17(a)(2) and (3) of the Securities Act, disgorgement plus prejudgment interest, and a civil penalty that could not exceed "the gross amount of pecuniary gain to such defendant as a result of the violation." Section 20(d)(2) of the Securities Act, 15 U.S.C. 77t(d)(2). Based on the allegation that Citigroup received $160 million in ill-gotten gains, it is reasonable to estimate that, if the Commission were successful at trial, the court

would have permanently enjoined Citigroup, ordered it to disgorge $160 million (plus prejudgment interest), and ordered it to pay a $160 million penalty.

The relief proposed in the consent judgment closely tracks this best-case trial scenario. The judgment permanently restrained and enjoined Citigroup from violating Sections 17(a)(2) and (3) of the Securities Act. It ordered Citigroup to disgorge $160 million in profits, to pay $30 million in prejudgment interest on that disgorgement, and to pay a $95 million penalty. Altogether, the monetary relief represented 81% ($285 million/$350 million) of what the Commission could have reasonably expected to obtain at trial if it prevailed. And the consent judgment further imposed mandatory injunctive relief, requiring Citigroup to change its approval and review processes for residential mortgage-backed securities and submit to monitoring by the Commission and enforcement by the court.

The proposed consent judgment thus obtained a significant portion of the relief sought without any litigation risk. While the district court's order "assumes that the SEC would succeed at trial in proving Citigroup's liability," there is at least some chance—as there always is—that the Commission would lose at trial and obtain nothing for investors, or win at trial and obtain lesser remedies than those ordered in the consent judgment. *Citigroup Stay Order*, 673 F.3d at 163. The consent judgment allowed the Commission to obtain substantial relief for

51

investors without risk and without delay, as the proposed consent judgment orders the prompt creation of a fund for distribution to injured investors.[22]  Under these circumstances, the proposed judgment was fair, reasonable, adequate, and in the public interest.

The district court nevertheless rejected the proposed consent judgment based on an unprecedented bright-line rule that should be rejected for the reasons discussed above.  The district court also criticized the proposed judgment because, in its view: (1) the penalty was "very modest," SPA 10; (2) the Commission did not charge Citigroup with scienter-based fraud, SPA 12; and (3) the consent judgment did not provide "collateral estoppel assistance" to private litigants or reveal "the truth" to the public, SPA 11, 15.  None of these criticisms justifies the rejection of the consent judgment.

---

[22] The district court stated that the proposed consent judgment "does not commit the [Commission] to returning any of the $285 million obtained from Citigroup to the defrauded investors" because the inclusion of the word "'may'" in the judgment "only suggests that the [Commission] 'may' do so." JA 244.  The judgment used the word "may" because distributions to injured investors cannot commence until the district court approves them.  The Commission intends to seek the district court's leave to distribute these proceeds.

**A. Under the Securities Act, the maximum penalty turns on a defendant's pecuniary gain, not its size or investor losses, and the $95 million penalty ordered in the judgment is not "modest" when compared to the $160 million penalty that the Commission could have reasonably expected to obtain at trial.**

The district court remarked that the consent judgment "results in a very modest penalty" that "is pocket change to any entity as large as Citigroup" and does not compensate investors for their losses. SPA 11; *see also* SPA 10 (describing the relief as including "only very modest penalties"). The $95 million penalty, however, is not "modest" when compared to the penalty the Commission could have reasonably obtained if successful at trial—it is 60% of that amount ($95 million/ $160 million). *Cf. United States v. Lexington-Fayette Urban County Gov't*, 591 F.3d 484, 489–91 (6th Cir. 2010) (holding that district court wrongly rejected a consent judgment because it disagreed with the amount of the penalty).

By comparing the penalty size to Citigroup's wealth and the estimated amount of investor loss, the district court disregarded the securities laws, which do not link penalties to a defendant's revenues or investors' losses. The law does not permit the imposition of a penalty that is greater than the "gross amount of pecuniary gain," no matter how that "pecuniary gain" compares to the defendant's wealth. Similarly, the law does not permit a court to tie disgorgement or penalties to investors' losses. *See* Andrew Ackerman & Jean Eaglesham, *SEC Pushes to*

53

*Toughen Penalties for Offenders*, WALL ST. J., Nov. 30, 2011, at C1 (discussing

the Commission's request for authority to calculate penalties based on losses).[23]

> **B.      The district court is not permitted to evaluate the consent
>            judgment based upon claims that the Commission did not bring.**

The district court further erred by asserting that the consent judgment was

not in the public interest because the Commission charged "Citigroup only with

negligence," not scienter-based fraud.  This precise issue arose in *Microsoft*, where

the D.C. Circuit "flatly reject[ed]" the "district judge's efforts to reach beyond the

complaint to evaluate claims that the government did *not* make and to inquire as to

why they were not made."  56 F.3d at 1459 (emphasis in original).  As that court

explained, the district judge, when conducting a public interest inquiry, may not

"construct his own hypothetical case and then evaluate the decree against that

case," but rather must assess the complaint as presented against the proposed

judgment.  *Id*.  The *Microsoft* ruling is entirely consistent with the Supreme

-----

[23] The district court also improperly compared the penalty imposed here and the
penalty imposed in a 2010 consent judgment with Goldman Sachs.  SPA 13 n.7.
That "dissimilar facts resulted in dissimilar penalties" does not justify rejecting this
consent judgment, particularly when the Commission charged Goldman Sachs with
scienter-based violations, but did not similarly charge Citigroup.  *Van Cook v.
SEC*, 653 F.3d 130, 144 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1582 (2012); *Hiller
v. SEC*, 429 F.2d 856, 858 (2d Cir. 1970) ("[W]e cannot disturb the sanctions
ordered in one case because they were different from those imposed in an entirely
different proceeding.").

Court's decision in *Heckler*, which commits the decision about whether to bring

certain charges—or any charges at all—"to an agency's absolute discretion."

*Heckler*, 470 U.S. at 831; *see Microsoft*, 56 F.3d at 1459–60 ("The court's

authority to review the decree depends entirely on the government's exercising its

prosecutorial discretion by bringing a case in the first place.").  As in *Microsoft*,

the consent judgment proposed by the Commission here may not be rejected

because the Commission, having conducted an exhaustive investigation of

Citigroup's conduct, declined to assert scienter-based allegations against Citigroup

in an exercise of its prosecutorial discretion.

### C.  The district court is not permitted to reject the consent judgment because it does not provide "collateral estoppel assistance" to private litigants or because it does not produce adjudicated facts.

The district court's concern that investors "cannot derive any collateral

estoppel assistance," SPA 12, from the consent judgment in private litigation

against Citigroup is removed from any factor that is relevant to determining

whether the consent judgment is fair, reasonable, adequate, or in the public

interest.[24]  The Commission supports the use of well-founded private civil actions

as a vehicle for investors to recoup losses and as a supplement to the Commission's

---

[24] This focus on "collateral estoppel" assistance belies any argument that the district court was not insisting on a determination (whether by adjudication or admission) of the underlying facts as a prerequisite to approval.

55

own enforcement powers. But as Congress recognized when it prohibited the consolidation of Commission enforcement actions and private actions without the Commission's consent (*see* Section 21(g) of the Exchange Act, 15 U.S.C. 78u(g)), Commission suits and private litigation serve "very different" purposes. S. REP. NO. 94-74 at 76 (1975), reprinted at 1975 U.S.C.C.A.N. 179, 254. Private plaintiffs seek to obtain damages from other private actors for harm that they suffer, whereas the Commission fulfills Congress's "mandated scheme of law enforcement in the securities area." *Id.* In making decisions about settling its own enforcement actions, the Commission (like other government agencies) is not required to consider whether a consent judgment will provide private litigants with "collateral estoppel assistance." The district court should not have rejected this consent judgment, which provided guaranteed relief without litigation risk, because proceeding to a trial with an uncertain result *might* afford private litigants "collateral estoppel assistance."

The district court also erred by asserting that the Commission failed in its "duty" to "see that the truth emerges." JA 247. The district court's conception of the Commission's "duty" cannot trump the Commission's responsibility to consider the "balance of advantages and disadvantages" presented by a consent judgment. *Clifton*, 700 F.2d at 748. The district court's order plainly reflects its

56

views about the Commission's role in establishing "the truth," but it is not "the proper function of federal courts to dictate policy to executive administrative agencies." *Citigroup Stay* Order, 673 F.3d at 163.

Moreover, the district court ignored that the public *was* adequately informed about Citigroup's actions. The Commission filed a complaint with detailed allegations describing the Commission's investigative conclusions. *Clifton*, 700 F.2d at 748 (explaining that a consent decree protects "the public by informing potential investors that a certain person has violated SEC rules in the past"). Citigroup cannot deny these allegations under the terms of the consent judgment. Moreover, in the memorandum that the Commission submitted to the court in order to answer its questions about the consent judgment, the Commission "did provide information to the court regarding how the evidence supported the proposed consent judgment." *Citigroup Stay Order*, 673 F.3d at 165. In light of the information already available to the public, the Commission made the reasonable decision that expending additional resources to proceed to trial in an attempt to adjudicate the facts was not justified in light of the adequacy of the relief obtained, the litigation risks associated with trial, and the need to devote resources to other matters.

**IV.** **If this Court does not exercise jurisdiction under Section 1292(a)(1), it should issue a writ of mandamus because the district court committed a clear error of law by creating a new bright-line rule regarding consent judgments that restricts the Commission's ability to settle cases.**

This Court should exercise jurisdiction over the district court's order pursuant to Section 1292(a)(1) and the Supreme Court's decision in *Carson*. *See supra* pp. 3–10. But if this Court determines that it lacks appellate jurisdiction under that provision, it should grant the Commission's petition for a writ of mandamus because (1) the Commission will "have no other adequate means to attain the relief it desires"; (2) "the writ is appropriate under the circumstances"; and (3) "the right of issuance of the writ is clear and indisputable." *SEC v. Rajaratnam*, 622 F.3d 159, 169 (2d Cir. 2010) (internal quotation marks omitted)*; Kensington Int'l Ltd. v. Rep. of Congo*, 461 F.3d 238, 242 (2d Cir. 2006) ("We may treat appeals dismissed for lack of jurisdiction as petitions for a writ of mandamus."). The "exceptional circumstances" here justify "the invocation of this extraordinary remedy," because the district court's order creates a novel rule that has significant implications for the Commission and other government agencies. *Cheney v. United States Dist. Ct.*, 542 U.S. 367, 380 (2004).

58

If the Court rules that it lacks jurisdiction under Section 1292(a)(1), the Commission will have no other adequate remedy to obtain the entry of the consent judgment it negotiated. *Rajaratnam*, 622 F.3d at 169–70. The district court directed the parties to prepare for trial, and absent the issuance of a writ, the Commission will lose the benefit of the bargain it struck. An appeal after final judgment will not be adequate because in the interim the Commission will have expended resources and faced the litigation risks that it sought to avoid when it exercised its reasonable judgment to enter into the consent judgment.

Mandamus is appropriate because the issue raised by the district court's order—whether injunctive consent judgments must be based on "facts, established either by admissions or trials," SPA 15—is novel and is exceptionally important. *Rajaratnam*, 622 F.3d at 171; *Cheney*, 542 U.S. at 381. In addition to committing the Commission to proceed to trial in this case, the district court's ruling could have significant implications for the Commission's entire enforcement program, which frequently utilizes consent judgments with "no admit/no deny" clauses. *Supra* pp. 23, 29, 46–50. The district court's rule could also affect the enforcement programs of other federal government agencies that rely heavily on consent judgments in which defendants do not admit, or outright deny, facts and liability. *Supra* pp. 23, 31–39. Resolution of the novel and significant question of law

59

presented here will provide certainty to the Commission—and other agencies—regarding future enforcement activities. *Schlagenhauf v. Holder,* 379 U.S. 104, 111 (1964) (authorizing use of mandamus "to settle new and important problems"); *In re IBM Corp.*, 687 F.2d 591, 599–600 (2d Cir. 1982) (granting writ of mandamus in a case related to approval of antitrust consent decrees in "light of the underlying issue of first impression").

A writ should issue because the district court's ruling constitutes a "clear abuse of discretion" and a "judicial usurpation of power." *Cheney*, 542 U.S. at 380; *Stein v. KPMG, LLP*, 486 F.3d 753, 759 (2d Cir. 2007). A rule barring consent judgments that are "unsupported by any proven or acknowledged facts" conflicts with a century-old judicial practice and intrudes upon the powers vested in executive agencies. *Supra* pp. 25–40; *see also Citigroup Stay Order*, 673 F.3d at 166 ("We know of no precedent that supports the proposition that a settlement will not be found to be fair, adequate, reasonable, or in the public interest unless liability has been conceded or proved and is embodied in the judgment."). That rule, if left standing, would interfere with the ability of the Commission, and other government agencies, to enter into consent judgments, which in turn would interfere with the power of agencies to exercise their reasonable judgment about how their finite law enforcement resources should be allocated. *Supra* pp. 41–50.

60

The district court erred by adopting this novel rule, and its rejection of the consent judgment proposed here was a clear abuse of discretion because the consent judgment was reasonable, fair, adequate, and in the public interest. *Supra* pp. 50–57; *cf. In re Smith*, 926 F.2d 1027, 1030 (11th Cir. 1991) (granting mandamus and ordering district court to enter settlement that it had rejected). Accordingly, if the Court concludes that it lacks jurisdiction under Section 1292(a)(1), it should issue a writ of mandamus ordering the district court to enter the consent judgment.

## CONCLUSION

The Court should reverse the district court's order rejecting the proposed consent judgment and remand with instructions to enter the judgment as proposed. Alternatively, if the Court concludes it lacks appellate jurisdiction under Section 1292(a)(1), it should issue a writ of mandamus ordering the district court to enter the judgment.

Respectfully submitted,

MICHAEL A. CONLEY
Deputy General Counsel

JACOB H. STILLMAN
Solicitor

61

MARK PENNINGTON
Assistant General Counsel


_____ /s/ *Jeffrey A. Berger* _____

JEFFREY A. BERGER
Senior Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040B
(202) 551-5112 (Berger)

May 2012

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,833 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word Perfect in 14-Point Times New Roman.

/s/ *Jeffrey A. Berger*

May 14, 2012                              Jeffrey A. Berger

## CERTIFICATE OF SERVICE

I hereby certify that, on May 14, 2012, I electronically filed the Brief of the

Securities and Exchange Commission, Appellant/Petitioner using the CM/ECF

system.  In addition, on the same day, I sent the original and six copies of the brief

to the following address:  U.S. Court of Appeals for the Second Circuit, Thurgood

Marshall U.S. Court House, 40 Foley Square, New York, NY 10007.


 /s/ *Jeffrey A. Berger*
Jeffrey A. Berger